3 Ill.2d 254 (1954)
120 N.E.2d 649
L.H. BARKHAUSEN et al., Appellants,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Appellee.
No. 33101.
Supreme Court of Illinois.
Opinion filed May 24, 1954.
Rehearing denied July 13, 1954.
*255 SWIREN & HEINEMAN, of Chicago, (HUBERT H. NEXON, and MASON L. BOHRER, of counsel,) for appellants.
MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, (SHERWOOD K. PLATT, of counsel,) for appellee; EVERETT LEWY, HOFFMAN & DAVIS, and RUBENSTEIN & BECKER, all of Chicago, (HARRY BECKER, MAURICE L. DAVIS, and IRVING GOODMAN, of counsel,) for certain bondholders.
Appellate Court reversed; circuit court affirmed.
Mr. JUSTICE BRISTOW delivered the opinion of the court:
This cause reaches this court as a result of the allowance of plaintiffs' petition for leave to appeal from the judgment entered by the Appellate Court for the First District, reversing the judgment entered in their behalf in the circuit court of Cook County. The plaintiffs in this proceeding are L.H. Barkhausen and Randolph Bohrer, copartners, doing business as the Doubleby Co., pursuant to a partnership agreement effective as of January 31, 1940. The defendant is the Continental Illinois National Bank and Trust Company of Chicago, as trustee under a certain indenture of mortgage dated May 1, 1935, representing a group of bondholders numbering more than 1000, with bonds totalling $2,300,000. The individual owners of these securities were not made parties defendant. The lower court ruled that they were adequately and properly represented by the trustee. The Appellate Court affirmed this ruling, and its propriety is not challenged here.
These are the salient facts that precipitated the legal controversy before us: The interested bondholders appearing in this case were originally owners of bonds in the United Masonic Temple Corporation, which bond issue *256 defaulted, and the mortgage securing them was foreclosed. A reorganization followed resulting in the formation of 32 West Randolph Corporation, a new company organized for the purpose of taking title to the property as a result of the foreclosure sale. This foreclosure sale wiped out the former owners of the property, and the bondholders became the owners. Each of the bondholders received the same principal amount of bonds in the new company that he had owned in the old company, and in addition received his proportionate share of stock (at the rate of 10 shares for each $1000 bond) of the new company representing ownership of the equity. This stock, for the purpose of insuring continuity of management, was placed in a voting trust. The 32 West Randolph Corporation caused to be issued on May 1, 1935, a mortgage indenture which purported to secure first mortgage leasehold bonds, which might be issued, in the principal sum not to exceed $2,678,500 and would be due on May 1, 1960. There are presently $2,300,000 in bonds outstanding, and the interest on them was paid in full to and including April 30, 1951. This obligation was secured by mortgage assets.
Late in 1945 plaintiffs became interested in the purchase of the equity of 32 West Randolph Corporation, as mortgagor in the mortgage assets, and, on January 29, 1946, all the right, title and interest of the mortgagor in the mortgaged property, and the right, title and interest of mortgagor under a certain lease to Oriental Theater Corporation dated January 1, 1936, and all the equipment and personal property in and about the Oriental Theater was conveyed to Herman Brash, as trustee, under a trust agreement of the same date, hereafter referred to as the Brash Trust. The purchase price ultimately agreed upon for this sale was $165,000. By this agreement it was recited that Brash, as trustee, was about to take title to the above mentioned property; that the beneficiaries of the trust were the plaintiffs; that the interest of the beneficiaries *257 should consist solely of a power of direction to deal with the title to the trust property and to manage and control that property, and the right to receive the proceeds therefrom; and that the trustee agreed to deal with the trust property only when authorized to do so in writing by the beneficiaries.
It further appears that on the same date, January 29, 1946, plaintiffs assigned their beneficial interest in the Brash Trust to the Continental National Bank as security for the mortgage indebtedness; that by a written instrument, hereinafter referred to as the assumption agreement, Brash, not in his individual capacity but in his capacity as trustee under the Brash Trust, assumed all of the covenants of the mortgagor in the mortgage indenture of May 1, 1935; and that the assumption agreement was executed pursuant to written authority, direction, consent and approval of plaintiffs as beneficiaries of the Brash Trust. Defaults occurred under the covenants of the mortgage indenture on May 1, 1952, in that the installment of interest on the bonds and the first installment of the real-estate taxes on the mortgaged property for the year 1951, due and payable on May 1, 1952, were not paid on that date, and there was a failure to deposit the fee rentals under the ground leases. As a result of the foregoing defaults, plaintiffs were notified by the Continental as trustee that foreclosure was contemplated, and that the bondholders would ultimately rely upon the plaintiffs to pay the entirety of the mortgage indebtedness. It was contemplated that there would be a deficiency of large proportions.
The plaintiffs instituted this suit in the circuit court of Cook County seeking a declaratory judgment exonerating them from any personal liability for the pre-existing mortgage debt of more than $2,300,000. The trial court entered summary judgment for the plaintiffs holding there was no personal liability on their part. The Appellate *258 Court, holding to the contrary, reversed the judgment of the circuit court without remanding and entered summary judgment against plaintiffs for more than $2,300,000. This determination was predicated upon the following instruments: (1) the indenture of mortgage executed by 32 West Randolph Corporation dated May 1, 1935, (2) a typical Illinois land trust agreement dated January 29, 1946, with Herman Brash as trustee and the plaintiffs as beneficiaries, and (3) an agreement dated as of January 29, 1946, assuming the pre-existing mortgage indebtedness, executed by Herman Brash, not individually but solely in his capacity as trustee of the land trust. In support of plaintiffs' motion for summary judgment was attached the affidavit and additional affidavit of Randolph Bohrer and to it were attached several exhibits. Affidavits were also filed on behalf of defendants supporting their motion to strike plaintiffs' motion for summary judgment. Those documents provided the factual background.
The uncontradicted proof before us demonstrates that plaintiffs never contemplated assuming personal liability in negotiating for the purchase of the Oriental property. Likewise, it is equally clear that the bondholders never contemplated any such liability on the part of the plaintiffs. They were repeatedly advised, in the negotiations for the sale, that the plaintiffs were not assuming any responsibility for the mortgage indebtedness. The plaintiffs in their offer to purchase provided for the transfer of the assets to the purchaser's nominee, Herman Brash as trustee, and provided for the pledge with the Continental Bank as mortgage trustee, of the purchaser's beneficial interest in the trust. The offer contained nothing with respect to any assumption of the bond obligations or personal liability on the part of the purchasers, but the schedule of assets, attached to and made a part of the offer, expressly specified that such assets were being purchased subject to the mortgage. The 32 West Randolph Corporation, in transmitting *259 the plaintiffs' offer of purchase to the voting trust certificate holders, who were also the bondholders, to obtain their consent to the sale, made it extremely clear in unmistakable language that the sale was subject to the underlying mortgage without any assumption of personal liability. Their first communication on this subject read as follows:
"Recently a proposal has been made to the company by Mr. L.H. Barkhausen and Mr. Randolph Bohrer, co-partners (doing business as Doubleby Co.) to purchase all of the assets of the corporation, subject to all of its liabilities (included in the liabilities are your bonds in the amount of approximately $2,525,500.00) paying therefor the sum of $140,305.50, which is equal to $5.00 per share for the stock outstanding, or at the rate of $50.00 for each $1,000.00 bond outstanding. * * * These gentlemen agree that if they become the purchasers they will deposit with Continental Illinois National Bank & Trust Co. of Chicago, the trustee under the mortgage securing your bonds, all evidences of ownership of the equity purchased, pledging that which they have purchased (that is, all of the assets of the corporation, subject to all of its liabilities) as further security for your bonds. In the event of any forfeiture due to default on the payment of interest or principal of your bonds, or any other default whatsoever under the mortgage securing your bonds, they would lose their entire investment.
"From the enclosed statement you will see that after providing for depreciation, and interest is paid on the bonds there is nothing left for the stock and this purchase by these men represents a speculation on their part." (Emphasis supplied.)
Not receiving the requisite number of consents to the sale a follow-up letter was sent to the bondholders by the voting trustees which read as follows:
"Several days ago the undersigned sent you a registered letter containing the offer made by L.H. Burkhausen and Randolph Bohrer to purchase all of the assets of 32 West Randolph Corporation subject to all of the liabilities of every kind and nature and specifically subject to your bonds which are outstanding in the approximate amount of $2,525,000.00.

* * *
"To refresh your memory, if you have mislaid our original letter, the purchasers propose to pay the sum of $140,305.50 into the Corporate treasury to be distributed to the holders of Voting *260 Trust Certificates which means the receipt by every holder of a $1,000.00 bond the sum of $50.00. You are not selling or parting with your bond. That you retain as in the past. The $50.00 you will receive for each bond (if you have not parted with your stock) will be distributed as a liquidating dividend to you. Everything that will be purchased under this proposal will be turned over and assigned to the Continental Illinois National Bank and Trust Company of Chicago, as Trustee under the mortgage securing your bonds as additional security for the payment of interest and principal on your bonds so that if there is a forfeiture due to default in the payment of principal or interest on your bonds or any other provision of the mortgage the buyer would lose the investment made ($140,305.50) and the Continental Illinois National Bank & Trust Company as Trustee would acquire for the bondholders the assets so purchased and you would have had $50.00 in cash for each $1,000.00 bond owned. In other words, you bondholders must be paid out or the purchaser will lose his investment." (Emphasis supplied.)
The affidavit of Randolph Bohrer discloses that shortly before he instituted this action, he sought from the officers of the defendant bank a report of their recollection of the Oriental transaction, after consultation and study of the files and memorandum made contemporaneously therewith. Based on such records and their memory, they reported to R.M. Kimball, vice-president of the defendant bank as follows:
"Prior to the actual transfer, Mr. Farrell (a voting trustee and secretary of the seller) and Mr. Bohrer discussed the matter with us and it was indicated that Mr. Bohrer and his associate, Mr. Barkhausen, were prepared to pay a sum of money which was eventually raised to $165,000 for the assets of 32 West Randolph Corporation, subject to its liabilities, including the outstanding bonds, provided the transaction could be so arranged that they could have the benefit of depreciation on the building, for income tax purposes. This could only be done by transferring the property to a trust, of which they would be the beneficiaries.
"While the trust assumed the payment of the outstanding bonds, as required by the mortgage of 32 West Randolph Corporation, there was no assumption of that indebtedness by the beneficiaries of the Trust and they indicated plainly that while they were willing to risk the loss of the money which would be paid to 32 West Randolph Corporation, neither they nor the Trustee were willing to personally assume the obligation of the bonds, and that unless *261 the transaction could be consummated on that basis, they were not interested. The various papers were then prepared and the deal was consummated on this understanding." (Emphasis supplied.)
There was still another letter (signed by Theodore C. Baer, L.J. Cullen and R.O. Farrell as voting trustees under the voting trust agreement for common stock of 32 West Randolph Corporation) to the holders of the voting trust certificates representing common capital stock of 32 West Randolph Corporation seeking to convince them that a sale to plaintiffs would be advantageous and soliciting their early transmittal of their executed consent to the sale. In this letter they were told that Barkhausen and Bohrer were men of great wealth and force, and that under their direction the mortgaged property, which was the only security for their investment, would be managed with superb skill. Quoting from the letter:
"These are men of large means, experienced in the operation of large real estate holdings. They have the means to furnish rehabilitation money for the betterment of the property and to increase its income, which, of course, is not possible under the present method of ownership and operation because all of the earnings of the property are pledged to the payment of interest and the retirement of bonds, beyond certain reserves permitted by the terms of the mortgage securing your bonds. These gentlemen agree that if they become the purchasers they will deposit with Continental Illinois National Bank & Trust Co. of Chicago, the trustee under the mortgage securing your bonds, all evidences of ownership of the equity purchased, pledging that which they have purchased (that is, all of the assets of the corporation, subject to all of its liabilities) as further security for your bonds. In the event of any forfeiture due to default on the payment of interest or on the principal of your bonds, or any other default whatsoever under the mortgage securing your bonds, they would lose their entire investment."
Risking being burdensome, we have taken the liberty to detail the foregoing uncontradicted proof, believing it to be important in our analysis of the legal issues here presented. It is our view that it represents a mutual agreement between the bondholders and the plaintiffs that no *262 personal liability would attach if Barkhausen and Bohrer should become the purchasers of the equity in question. The bondholders were to receive $165,000 which represented about $50 for each $1000 bond, and they were to also enjoy the advantage of having their mortgaged assets managed by shrewd and responsible men, thus adding security to their investment. The plaintiffs insist that our law is not so inflexible and technical as to inflict upon them a $2,000,000 liability when the record so clearly demonstrates that such would be contrary to the mutual agreement of the contracting parties.
Although plaintiffs assert that they do not care to find refuge in a determination in the United States District Court for the Northern District of Illinois, Eastern Division, it is significant to note that April 15, 1946, an involuntary petition for reorganization was filed against the Randolph Corporation by representatives of the same bondholders whom Continental represents in the present action. The title of that action was "In the Matter of 32 West Randolph Corporation, Debtor No. 46B105." Therein the plaintiffs herein were joined as parties defendant. The petitioning bondholders alleged that the Doubleby transaction violated the Illinois Statute of Frauds and Bulk Sales Act because Barkhausen and Bohrer had not personally assumed the covenants and obligations of the mortgage indenture, and because the assumption by Herman Brash, as trustee and not individually, added nothing to the bondholders' security. After extended hearings in which plaintiffs were represented and appeared, Special Master Joseph F. Elward, on September 14, 1948, made certain findings of fact which were subsequently adopted, in a memorandum opinion filed March 31, 1949, by Judge Campbell, which was as follows:
"Under the mechanics of the Doubleby transaction, neither Barkhausen nor Bohrer executed any writing to assume or become liable for the payment of the principal *263 or interest on the leasehold bonds or any of them secured by the mortgage indenture of May 1, 1935; and neither Barkhausen nor Bohrer, jointly or severally, so far as the record here shows, has any liability for the payment of said principal or interest. The assumption of the mortgage indebtedness by Brash, not individually but as Trustee, was an assumption without any financial responsibility on the part of the assumer and such assumption has not increased or strengthened the collectibility of the leasehold bonds. The mechanics of the Doubleby transaction whereby the conveyance was made to Brash, as Trustee, who assumed the mortgage indenture, were obviously devised to constitute a formal compliance with the provision of the mortgage indenture of May 1, 1935, requiring any transferees of Debtor to assume the mortgage indebtedness  and at the same time avoid financial liability on Doubleby Company for the mortgage."
It will be noted that reference is made in the above opinion to the fact that there was a provision in the mortgage indenture of 1935 requiring any transferee of the debtor to assume the mortgage indebtedness. However, it must be borne in mind that the plaintiffs were not a party to and were not bound in any way by the instrument. If that provision was not enforced it may well be the conveyance was ineffective and the bondholders could be heard in urging its invalidity, but without expressly assuming the obligation, the purchasers are not liable for it because the seller conveyed without compliance with the terms of the mortgage. We are of the opinion that the interpretation expressed by the Federal court is a sound and reasonable one.
The defendant here makes the argument that because Bohrer and Barkhausen, as beneficiaries of a conventional Illinois land trust, had authority to direct their trustee in the administration of the trust property, he was their agent, and his assumption of the mortgage debt solely as such *264 trustee was an assumption of that debt by the beneficiaries as principals. Defendant seems to lose sight of the agreed purposes of the instrument under scrutiny. If title had been taken and the assumption agreement had been executed by a corporation, the individual purchasers would of course have been immune from personal liability as permitted by the mortgage indenture but would not have received the personal benefit of depreciation on the building for income tax purposes. If title had been taken by the purchasers individually and they had executed the assumption agreement, they would have obtained the benefit of depreciation for income tax purposes but would have been liable personally for the pre-existing indebtedness, contrary to their intention and agreement between the parties. Accordingly, it was agreed by the seller and the buyers, with the knowledge and acquiescence of the defendant bank as mortgage trustee, that title would be placed in the land trust and the assumption agreement executed by the trustee solely in his trust capacity. Thus, the purchasers would acquire the benefits of depreciation for income tax purposes, but, in accordance with the agreement between the parties, the rights of the bondholders, so far as the purchasers were concerned, would be limited to the mortgaged premises and the trust property. And, of course, as voting trust certificate holders, the bondholders got the purchase price invested by the plaintiffs. The assumption of the mortgage by Brash, as trustee, rather than by the plaintiffs, was to insulate them from liability. The record clearly indicates that the authority of Brash, if he be regarded as agent, did not extend to, and was known not to extend to, the incurring of personal liability for his principal.
The use of a nominee is uniformly recognized as an approved practice in limiting the liability of principals in real-estate transactions. (Naas v. Peters, 388 Ill. 505; *265 In re Childs Co. 163 Fed.2d 379, 2nd Cir.1947.) In the Childs case one Brodsky had been the successful bidder for real estate constituting a part of the bankrupt's estate. As the successful bidder, Brodsky was directed to make a $30,000 deposit, which he did, and to enter into a formal purchase contract. Instead of signing the contract himself, he caused the contract to be signed by his nominee, and this contract was subsequently approved by the bankruptcy court. Thereafter Brodsky instructed his nominee to refuse to carry out the purchase contract. The bankruptcy court cited Brodsky for contempt for failing to consummate his bid. Upon appeal, the Court of Appeals for the Second Circuit reversed, pointing out that the use of the nominee was a well-established business practice intended, and effective, to restrict the principal's liability. The court said:
"It is familiar practice in real estate transactions, and particularly when a purchase money mortgage is to be given, for the real purchaser to take title in the name of a nominee or `dummy' who will execute the mortgage; thereby the real purchaser avoids personal liability for any deficiency judgment in case the mortgage is foreclosed. [Citations.] In such cases the vendor usually demands a down payment believed to be large enough to insure against the mortgagor's default, and where the mortgagee knows he is dealing with a `dummy,' he is actually contracting for the land as his sole security. See 43 Yale L.J. 140, 141. In the case at bar, Brodsky deposited $30,000 but, instead of assuming personal contractual obligations, he offered the vendor a contract signed by Weingarten, and this was accepted by the vendor and approved by the court. On the record before us we can regard this only as a substitution, with the court's approval of Weingarten's obligations for those which might have been demanded from Brodsky. By accepting Brodsky's nominee as the only promisor the vendor must be understood as consenting to look to the *266 $30,000 deposit as all he is to get from Brodsky. If that was not the intended result the trustee should have offered proof of what it was."
In that case the court pointed out that, in a "strawman" case, the party seeking to go beyond the "strawman" had the burden of showing, if they could, the existence of an agreement changing the "strawman" practice and imposing personal liability upon the real parties in interest. Here there is a complete absence of any such proof, but on the contrary the proof is conclusive and uncontradicted that the nominee herein was used for the agreed purpose of insulating the beneficiaries against personal liability.
Appellee makes the further contention that the land trust under consideration is a different kind of instrument from that ordinarily used in commercial practice, in that the beneficiaries failed to use exculpatory words in the instrument  that they failed to assert their refusal to assume personal liability for the bonded pre-existing indebtedness. The trial court disposes of this contention in this manner: "But wherever he expected the presence of such words [exculpatory words] it is immaterial because the plaintiffs didn't have to relieve themselves of liability. The contrary is true. Before they can be made personally liable they would have to expressly or by implication promise to pay. The law relieves them of responsibility. Never is responsibility on a pre-existing mortgage or debt imposed upon the purchaser of land unless he expressly or by implication makes himself liable. Even if the trustee in this case did not exclude himself from individual responsibility Barkhausen or Bohrer would not be liable, but it is clear that the only thing that Brash has undertaken by that assumption of liability was to be liable as trustee, and that only the trust property was to answer the debt." We agree with Judge Fisher in his conclusions that there is nothing asserted in the assumption agreement that will justify an imposition of the claimed personal liability of the plaintiffs, *267 and that there is nothing unasserted that by any legal implication attaches personal liability. The failure to include the usual exculpatory words in the assumption agreement in this case does not give rise to personal liability of the beneficiaries.
The defendant in its brief strongly contends that the proof of all negotiations antedating the execution of the assumption agreement is inadmissible because it violates the parol evidence rule. It is argued that the trust agreement is clear and unambiguous and needs no extrinsic evidence for clarification. Nowhere in the instrument appears the names of the beneficiaries as promisors. To impose liability, just as the court said in the Childs case, there must be a showing of an agreement changing the "strawman" concept. Here the proof conclusively is the very opposite. The evidence adduced here does not vary or contradict the written instrument but deals with the existence or nonexistence of personal liability by the plaintiffs nowhere touched in any of the instruments. By reference to the extrinsic evidence offered here, we are convinced that the land trust agreement employed by the parties hereto was used as a protection of the beneficiaries against personal liability. Several of the cases relied upon by the defendant advert to the proposition that parol evidence should be received to show the intention of the parties  that the remedy of the creditors should be limited to the assets of the trust estate. Schumann-Heink v. Folsom, 328 Ill. 321; Shelton v. Montoya Oil & Gas Co. 272 S.W. 222, (Tex. Civ. App. 1925).
This court, in considering language identical with that employed in the Brash Trust, had this to say in the Shumann-Heink case: "In the case at bar the trustees did limit their liability by specifically stating that the contract was executed `not individually but as such trustees to bind the trust estate.' Under the authorities this was sufficient. A covenant by trustees, `as such trustees but not otherwise,' *268 to re-pay a loan is a covenant to re-pay the money out of the trust fund, only, and does not impose any personal liability upon the trustees."
In 2 Bogert, Trusts and Trustees, (1953) 379-380, the effect of a trustee's signature is considered. The text writer points out that the signature by one as trustee and not individually raises an ambiguity. It, therefore, appears proper to consider all of the preliminary negotiations that led to the execution of the instruments underlying this dispute. In the following cases the Illinois courts approved the rule admitting parol evidence for the purpose of showing the extent of liability intended to be created by signatures where there may be an ambiguity. Ohio and Mississippi Railroad Co. v. Middleton, 20 Ill. 629, 634; Scanlan v. Keith, 102 Ill. 634, 642; Vail v. Northwestern Mutual Life Ins. Co. 192 Ill. 567, 569.
Finally, the plaintiffs argue with much force that if the assumption agreement being considered here has the consequences attributed to it by appellee, it was executed and delivered as a result of a mutual mistake and should be reformed in this action. Replying to this argument appellee asserts (1) that plaintiffs failed to allege mutual mistake in their original complaint, (2) that reformation relief was not requested in that complaint, and (3) if there was a mistake it was a mistake of law, thus foreclosing equitable relief. There is no reason why this court should not completely dispose of this case without a remandment for reformation purposes. Section 4 of the Civil Practice Act reads that the act "be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties." Giving consideration to section 259.50 (Supreme Court Rule 50) on amendment of pleadings and process under section 92(1) (a) of the Civil Practice Act, also sections 33, 34, 44 and 46 of the Civil Practice Act, eliminates the first two of the appellee's contentions. The pleadings and *269 the plaintiffs' motion for a summary judgment make a clear case for the reformation of the assumption agreement so as to exclude personal liability. They "spell out" the instrument to be reformed and establish beyond any doubt that if its language is capable of misconstruction so as to imply personal liability on the plaintiffs, it should be clarified.
But, appellee says that this court is powerless to remedy the mistake, if there was one, because it was a mutual mistake of law. What constitutes a mistake of law or a mistake of fact is a subject upon which many conflicting and irreconcilable discourses have been written. In Illinois there are well-reasoned opinions that hold that relief is appropriate whether one views a mistake to be one of fact or one of law. Darst v. Lang, 367 Ill. 119, is one that is peculiarly applicable. In that case aging parents deeded to their beloved daughter their farm, intending to reserve unto themselves a life estate but mistakenly failing to do so. This daughter after several years, upon learning of their failure to reserve their life estate, sought to deprive her father and mother of the proceeds of the premises which they had been enjoying uninterruptedly since the execution of the deed. In that proceeding reformation was sought because of a mistake, but the daughter urged the applicability of the rules that extrinsic evidence cannot be considered and that a court of equity is powerless to remedy a mistake of law. The court in rejecting those arguments used this language which we believe appropriately applies to the situation before us: "Relief is not barred in a proper case because the mistake is one of law. In Peter v. Peter, 343 Ill. 493, we recently said: `The general rule that relief may not be had in equity against mistakes of law has by no means been invariably applied in this country nor in England. Where injustice would be done by its enforcement such injustice has been avoided by declaring that a mistake such as to the title to property or *270 the existence of a certain particular right, though caused by an erroneous idea as to the legal effect of a deed, * * * was really a mistake of fact and not strictly one of law and so did not constitute an insuperable bar to relief. * * * The distinction between ignorance or mistake as to a general rule of law prescribing conduct and a mistake as to private rights or interests of a party to a written instrument has frequently been drawn. It has also been said that there is no established rule forbidding the giving of relief in any case to one injured by reason of a mistake of law, but that whenever it is clearly shown that parties in their dealings with each other have acted under a common mistake of law and the party injured thereby can be relieved without doing injury to others, equity will afford him redress.' In Reggio v. Warren, 207 Mass. 525, 93 N.E. 805, the court said, `So it has been said that the important question was not whether the mistake was one of law or of fact, but whether the particular mistake was such as a court of equity will correct, and this depends upon whether the case falls within the fundamental principle of equity that no one shall be allowed to enrich himself unjustly at the expense of another by reason of an innocent mistake of law or fact entertained by both parties.'"
The construction of the assumption agreement urged by the defendant would certainly result in a gross miscarriage of justice. If the instruments giving rise to the claimed personal liability of plaintiffs have been mistakenly worded  or mistakenly executed  this court is not powerless to grant relief, regardless of how the mistake may be classified, whether one of fact or one of law. The burden imposed upon Bohrer and Barkhausen by the judgment of the Appellate Court involves many hundred thousand dollars. It is true that the bondholders' investment has gone through a disappointing period of depreciation. It is a matter of common knowledge that television, bringing into *271 the home, less expensively, entertainment of all sorts, has damaged the theater business immeasurably. It was not a lack of managing skill on the part of Bohrer and Barkhausen that brought on this adverse turn of events. The bondholders well knew that they did not bargain for  that they did not pay for and did not expect  having plaintiffs become guarantors of their investment. Any interpretation of the various instruments being considered which implies the personal liability urged by the defendants is a gross mistake, and, whether it is one of fact or one of law, should be remedied. To that end the judgment of the Appellate Court entered herein is reversed and the judgment of the circuit court is affirmed.
Appellate Court reversed; circuit court affirmed.