THE BANK OF COMMERCE, Plaintiff-Appellant, *v.* RIVERSIDE TRAILS *et al.*, Defendants-Appellees.

Second District    No. 76-189

Opinion filed September 22, 1977.—Rehearing denied October 19, 1977.

SEIDENFELD, J., specially concurring.

Charles E. Cronauer, Harold A. Rissman, and Robert C. Jenkins, all of Rissman & Jenkins, of De Kalb, for appellant.

Ross & Stevens, S. C., of Madison, Wisconsin, and Edward Diedrich, of De Kalb, for appellees.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The Bank of Commerce of Milwaukee (hereinafter referred to as the plaintiff Bank) appeals from a decree of foreclosure which foreclosed a mortgage executed by a land trustee—The De Kalb Bank—but relieved the beneficiaries of the land trust of any personal liability on the note secured by said mortgage. While the DeKalb Bank is a nominal defendant here by reason of having executed the promissory note in question, it specifically disclaimed any liability under the note by the following exculpatory language which appeared just above the signature of its trust officer:

"This note is executed by DE KALB TRUST AND SAVINGS BANK, not personally but as Trustee as aforesaid in the exercise of the power and authority conferred upon and vested in it as such Trustee, and is payable only out of the property specifically described in said mortgage securing the payment hereof by the enforcement of the provisions contained in said mortgage. No personal liability shall be asserted or be enforcible against the Trustee, such liability, if any, being expressly waived by each taker and holder hereof, but nothing herein contained shall modify or

discharge the personal liability expressly assumed by the guarantors hereof, if any."

M. G. Astleford, Gordon E. Carncross and Robert Kassel (hereinafter referred to as the defendants) whose names appear as guarantors of the note, were partners with others in a joint venture known as Riverside Trails. The joint venture was formed to acquire and develop certain vacant land in DeKalb County. This land had previously been owned by Darrell R. Wild and the defendants borrowed $375,000 from the plaintiff Bank and used these funds to pay off a previous encumbrance owed by Wild and for expenses in developing the property.

At the time the loan was made the land was in a land trust with The DeKalb Bank, as trustee. The mortgage given to secure the debt of $375,000 and the promissory note evidencing same were executed by the land trustee as noted above with the usual disclaimer as to any personal liability whatsoever on the DeKalb Bank's part. The promissory note in the amount of $375,000 at 8% per annum had attached to it an accompanying document entitled "Guaranty," reading as follows:

"For value received, we hereby guarantee the payment of the within note at maturity or at any time thereafter or any renewal of the same with interest at the rate of eight (8%) percent per annum until paid, and hereby waive protest, demand and notice of demand and nonpayment and suit against the makers and consent that the time of the payment of this note may be extended from time to time without affecting our liability thereon."

The note was executed on July 31, 1972, and was due July 31, 1973. On July 25, 1973, the directors of the plaintiff Bank authorized an extension of the $375,000 loan for one year, from July 31, 1973, to July 31, 1974. An "extension note" was prepared by the plaintiff Bank bearing interest at the rate of 11% instead of the original 8% and was apparently initially sent to Jerry Shea, a Wisconsin attorney representing the defendants, to procure the necessary signatures. Gary Cordes, a De Kalb attorney, testified that Shea, not being familiar with Illinois land trust procedure, sent the extension note to him for completion of the necessary paper work. Cordes testified that he prepared separate original letters of direction for Astleford, Carncross and Kassel, and another for a joint venturer (who did not sign the Guaranty but who, along with the three defendants, apparently had the power of direction), and sent one to each of these persons asking them to sign the direction and return it to Cordes for presentation to the De Kalb Bank, if they wished the De Kalb Bank to sign the extension note and return it to the plaintiff Bank. He testified that with each letter of direction he sent a copy of the extension note. The letter of direction described the document to be signed by the trustee merely as "Extension Note Agreement," however it stated that a copy of that

document was attached. The paper work took some time to complete. The letters of direction were eventually all executed and returned to attorney Cordes for delivery to the De Kalb Bank and in turn the document designated "Extension Note" was executed by the De Kalb Bank, as trustee, and returned to the plaintiff Bank on December 14, 1973. The Extension Note, dated July 31, 1973, promised to pay the sum of $375,000 to The Bank of Commerce "with interest on the unpaid balance at the rate of 11% per year plus 1% service charge." It was due July 31, 1974. Just above the signature line appears the following:

"This note is executed, delivered and accepted, not in payment, but to extend the time of payment and modify the provisions of a note in the original amount of $375,000 dated July 31, 1972, between the maker(s) and payee of this note."

It was executed by the De Kalb Bank as trustee and not personally.

The extension note not having been paid on July 31, 1974, the plaintiff Bank made demand on Riverside Trails, Astleford, Carncross and Kassel for payment thereof. There was some point raised about whether proper notice of default and demand for payment had been served on all these parties. Registered mail return receipts and other correspondence in the record, however, leave little doubt that legally sufficient notice of default and demand for payment were made and came to the attention of the debtor parties.

In a letter to the president of the plaintiff Bank dated September 9, 1974, which is in evidence, Kassel explained that the three guarantors could not raise the money to pay the note off at that time, without severe sacrifice and asked for additional time. In the course of this letter he said:

"I recognize that we are personally on the loan * * * I reaffirm for all my partners our liability under the loan * * * I just tell you that because of this terrific financial crunch it would be an impossible chore to come up with $375,000.00 today."

To this letter the plaintiff Bank's vice-president replied that he was sorry that they could not extend the loan any further and must take legal action unless it was paid by October 1. The note not being paid, the plaintiff Bank instituted foreclosure proceedings and asked for a personal deficiency decree, if necessary, to cover the amount of the note, accumulated interest and attorney fees.

The foreclosure suit resulted in a large deficiency, but the defendants were not held personally liable therefore. The court adopted defendants' theory that there had been a material alteration of the obligation assumed by the guaranty which voided their liability.

In its initial answer to the complaint for foreclosure filed January 13, 1975, the defendants contended that a personal deficiency decree should not be allowed against them because the plaintiff Bank had breached a

commitment to lend additional moneys to develop the property, which commitment had induced the defendants to guarantee the indebtedness. The plaintiff Bank denied this commitment was ever made. In November 1975, some 10 months after the case had been set for trial, the defendants amended their answer to include the defense that "the note upon which the obligation herein is based, made and delivered to the plaintiff, was materially altered from that described by the plaintiff in the complaint in that the note so made originally specified interest at the rate of 8% per annum, and that said note was later altered without the consent or knowledge of the defendants, and each of them, to read 11% interest herein."

The affirmative defense further alleged that the alteration was made "after the delivery to the plaintiff" and "was altered by the plaintiff or at the instruction of the plaintiff, with the intent to wrongfully cheat and defraud the defendants * * *."

The testimony at trial, however, was far from proving these allegations. It showed very clearly that the note was not "altered" in the sense that word is used in the affirmative defense. Indeed, the defendants admitted that they were not claiming there had been actual alterations of the extension note—they admitted at trial the "alteration" was merely a difference between the interest rate as set out in the original note and the interest rate as shown in the extension note. They also contended the interest rate had been made more onerous after the signing thereof by the De Kalb Bank when plaintiff Bank inserted the word "quarterly" after it received the executed note back from the De Kalb Bank. This is an unwarranted claim, for the original note clearly required interest to be paid quarterly and the note was accepted by the defendants on that basis. The De Kalb Bank is not making this contention and it is difficult for us to understand how the defendants can at the same time disclaim any personal knowledge of the terms of the extension note—which they all testified they did not recall ever having seen—and yet complain that the word "quarterly" was inserted *after* the note was signed by the De Kalb Bank.

■■ The plaintiff Bank acknowledges the familiar doctrine of the law of guaranty that the guarantor is discharged from his obligation by a material alteration thereof without his knowledge and consent. It contends, however, that the change in the interest rate of the extension note was in no sense an "alteration" and in any event was clearly assented to and accepted by the defendants when they directed the land trustee to execute the extension note agreement. It is, of course, a familiar exception to the general doctrine relieving the guarantor from liability by reason of a change in the obligation assumed, that the doctrine has no application where the obligor has knowledge of and assents, either expressly or by

implication, to such change. 38 Am. Jur. 2d *Guaranty* §81 (1968); *Knoebel v. Kircher* (1864), 33 Ill. 308.

In deciding this case, then, the duty devolves upon us to determine whether the evidence fairly supports the plaintiff Bank's contention that the changes in the terms of the extension note agreement were assented to and accepted by the defendants.

■■■ We should remark at the outset, before attempting to resolve that question, that in the circumstances of this case it is not at all clear that the defendants were mere guarantors, as they contend, and entitled to the defenses which the law accords to a guarantor. It is true that the document attached to the promissory note which the mortgage secured is entitled "Guaranty," but the relationship of a guarantor in a transaction, rather than principal debtor, depends to a large extent upon the intent of the parties as evidenced by the nature of the transaction itself. (*Chicago Daily News, Inc. v. Kohler* (1935), 360 Ill. 351; *Phillips v. O'Connell* (1945), 326 Ill. App. 15; 38 Am. Jur. 2d *Guaranty* §3 (1968).) Here the credit was obviously extended by the plaintiff Bank only to the individuals who signed the "guaranty" since the De Kalb Bank specifically disclaimed any liability on the note and it was the defendants who received the proceeds of the loan and used them. Whose, then, was the debt? We do not, however, pursue this question to its ultimate resolution, since we find from a fair analysis of the evidence that the defendants were aware of the changes made by the extension agreement and by renewing the note on those terms, assented to the new terms and accepted them as their obligation.

The evidence adduced at trial and the logical inferences flowing therefrom support no other conclusion than that the defendants did, indeed, by their conduct, waive their defense of "material alteration" of the "guaranty instrument." The defendants were experienced businessmen all of whom had considerable background in land development and, naturally, in financing such developments through banks. Carncross was a C.P.A. with extensive experience in real estate transactions. Kassel was a vice-president of an insurance company with real estate holdings. Astleford was a contractor and had had experience in land development over a period of years. They were well aware from the land trustee's disclaimer and the language of their loan guaranty that they were assuming personally any liability which might develop if they let the mortgage become delinquent and deliberately allowed a foreclosure to take place as was acknowledged by Kassel's letter to the plaintiff Bank dated September 9, 1974. They were not innocent third parties extended credit on someone else's behalf but were seeking credit for themselves in a potentially profitable venture.

■■ While the defendants maintained at oral argument that they did

not take the initiative in seeking an extension of the note when it became due in July of 1973, we may take judicial notice that it is not the custom and practice of commercial banks to gratuitously extend a note for $375,000 when it becomes due. There is no evidence that the defendants offered or were able to pay the note when it became due in July of 1973, and since it is the custom for the borrower to seek an extension, rather than for the bank to volunteer it, there is no reason to doubt that in this case the extension was requested by the defendants.

The real gist of the defense, however, is that even if they "agreed" to the extension, they did so only on the basis of the original terms of the note—that they did not agree to an increase in the rate of interest and that the increase in the interest charged was a material alteration of the guaranty made without their knowledge and consent, which discharged them from their obligation under the guaranty.

The contention that the change in the interest rate under the extension agreement was made without the knowledge and consent of the defendants is clearly against the manifest weight of the evidence and the logical inferences flowing therefrom. One of these inferences is that the defendants were anything but naive—they were mature, sophisticated men who were quite willing to take a chance for the sake of possible gain and that they were not easily taken advantage of.

Nor do the facts of the transaction as brought out in the testimony lend any support to the contention that the defendants were misled and were imposed upon by an unauthorized increase in their liability as guarantors. Gary Cordes—who acted as attorney for the defendants in procuring the necessary signatures to the letter of direction so that the trustee could execute the extension agreement—testified that he prepared the letter of direction to the De Kalb Bank and through direct correspondence with the defendants, procured their signatures to it. He testified he attached a copy of the extension note agreement to each copy of the letters of direction he sent to each of the three defendants asking them to execute the letter of direction and return it to him for delivery to the De Kalb Bank. The defendants at trial acknowledged their signatures on the letters of direction, although they claimed they did not recall signing them. None of them could recall having seen the extension agreement and all professed ignorance of its terms. Kassel, however, obviously received a copy of the extension agreement because he admitted his signature thereon, he having signed it, he said, "by mistake," as well as signing the letter of direction. Since Kassel received a copy of the extension agreement and attorney Cordes testified he sent one to Carncross and Astleford as well, there is ample evidence to indicate that they also received a copy. Moreover, the letter of direction refers to a copy of the document to be authorized as being attached. Aside from the fact that

experienced businessmen are not to be expected to authorize a document to be signed on their behalf without knowing what the document says, since the letter of direction states that a copy is attached, we can properly assume that the lack of further inquiry as to the contents of the documents supposedly attached, on the part of the defendants, and the authorization of its execution by Kassel, Carncross and Astleford, indicates either that a copy was attached or that its contents were known to them otherwise. The letter of direction was sent out to the defendants in August 1973, and all copies were not signed and delivered to the De Kalb Bank until sometime in December 1973. With this much time having elapsed between the receipt and the return of the documents, it is reasonable to assume that the parties consulted among themselves and made an informed decision before signing the letter of direction.

Finally, we cannot but consider as mitigating against the force of the defendants' contention, the fact that they did not raise this point at all in their original answer to the complaint for foreclosure and deficiency judgment. As indicated above, their initial answer, filed in January of 1975, invoked an affirmative defense of the defendants having been misled by a promise to lend additional moneys. It was not until November of 1975, some 10 months later, that the defendants asserted the defense of material alteration of their original guarantee. The delay in suggesting this argument is consistent with Kassel's letter to the plaintiff Bank in September 1974—after the default—in which he clearly accepted personal liability for the partners and raised no question about the interest rate. Under these circumstances the "material alteration" theory appears to be a contrived argument.

Summing up, therefore, it appears to us the manifest weight of the evidence is that the defendants accepted the extension note on the terms contained therein and authorized its execution on their behalf by the De Kalb Bank. They knew they were personally liable on the note and that the trustee was not. By authorizing the extension by the trustee they secured the needed delay, which was in effect a new loan. Having authorized the extension and received its benefits, they cannot now be regarded as innocent third parties such as the law of guaranty is designed to protect.

The defendants cannot realistically deny they authorized the extension of the loan—it would not have been anyone else who authorized it since its extension served only the defendants' purposes. They contend, however, that even if they did authorize the extension they did not "guarantee" it and therefore they have no liability since the guaranty applied only to the original note and having been expanded beyond its stated terms, it became null and void. They contend, therefore, that in authorizing the extension they accepted no personal liability thereunder

and the plaintiff Bank is limited to the foreclosure of the mortgage itself as its measure of recovery. It is hardly believable that the plaintiff Bank would have bothered to have an extension agreement prepared if it was intended to limit the recovery to the mortgage proceeds, in any event. That defendants understood only too well that they were still liable on the note is clearly indicated by the letter of September 9, quoted above. It was not until some 14 months after that letter was written that the defendants suddenly came to the self-serving conclusion that they had been taken advantage of under their "guaranty" because the rate of interest had been increased in the extension agreement from 8% to 11%.

Since the defendants had received the funds for their own uses and had approved the extension of the note and authorized its execution by their trustee and agent, the argument by which they now seek to disclaim the entire debt is not an appealing one on moral grounds, but they contend it is an inevitable result of the law of guaranty. We do not agree with this conclusion in view of the intervening question of estoppel by reason of informed consent, as indicated above.

Irrespective of the question raised earlier in this opinion as to the true nature of the defendants' obligation to the plaintiff Bank—whether that of guarantor or principal debtor—it is our opinion that the manifest weight of the evidence is that the defendants accepted the extension note on the terms contained therein and are estopped to raise the defense of material alteration of their obligation.

The judgment of the circuit court of De Kalb County is reversed and the cause is remanded for further proceedings, not inconsistent with this opinion.

Judgment reversed.

BOYLE, J., concurs.

Mr. JUSTICE SEIDENFELD, specially concurring:

I concur with the holding expressed in the majority opinion. The manifest weight of the evidence compels the conclusion that defendants accepted the extension note and authorized its execution on their behalf by the trustee, De Kalb Bank. It then follows they may not take advantage of the defense that a guarantor is discharged from his obligation by a material alteration of the principal debt.

I am disturbed, however, with the dicta which questions whether defendants were "mere guarantors" as opposed to "principal debtors." The majority's reasoning is apparently based upon the fact that defendants' joint venture, Riverside Trails, received the credit extended by the Bank of Commerce pursuant to the mortgage. The dicta suggests that when a beneficiary of a land trust guarantees a mortgage obligation

of the land trust and also receives the credit which accrues from the mortgage, the beneficiary as a matter of law assumes the status of a "principal debtor." I must disagree because whether a beneficiary has assumed a mortgage obligation of the land trust is strictly a factual matter based upon evidence that the beneficiary did, in fact, agree to be bound as a principal.

The majority's dicta is similar to the argument raised before the Illinois Supreme Court in *Barkhausen v. Continental Illinois National Bank & Trust Co.*, 3 Ill. 2d 254, 263-64 (1954). The defendant bank in that case made

> "* * * the argument that because Bohrer and Barkhausen, as beneficiaries of a conventional Illinois land trust, had authority to direct their trustee in the administration of the trust property, he was their agent, and his assumption of the mortgage debt solely as such trustee was an assumption of that debt by the beneficiaries as principals."

The Supreme Court rejected the argument and observed,

> "The assumption of the mortgage by Brash, as trustee, rather than by the plaintiffs, was to insulate them from liability. The record clearly indicates that the authority of Brash, if he be regarded as agent, did not extend to, and was known not to extend to, the incurring of personal liability for his principal.
>
> The use of a nominee is uniformly recognized as an approved practice in limiting the liability of principals in real-estate transactions. (*Naas v. Peters*, 388 Ill. 505; *In re Childs Co.* 163 Fed. 2d 379, 2nd Cir. 1947.)" (3 Ill. 2d 254, 264-65.)

Thus, land trusts are a valid technique for limiting the liability of its beneficiaries by the creation of a "strawman," the trustee. According to *Barkhausen* whether a beneficiary has specifically undertaken the obligation of the land trust mortgage is a factual matter to be established by the evidence. The Supreme Court stated in reference to *In re Childs Co.*, 163 F.2d 379 (2d Cir. 1947),

> "* * * the court pointed out that, in a 'strawman' case, the party seeking to go beyond the 'strawman' had the burden of showing, if they could, the existence of an agreement changing the 'strawman' practice and imposing personal liability upon the real parties in interest." 3 Ill. 2d 254, 266.

Moreover, the dicta is completely unnecessary in view of the fact that the mortgagee, Bank of Commerce, has met its evidentiary obligations relating to the beneficiaries' obligations as guarantors. The record manifestly demonstrates that defendants both executed the guarantee obligation and later authorized an extension under modified terms.

For these reasons I concur only in the narrow holding of the majority opinion.