**FIRSTSOUTH, F.A., f/k/a Firstsouth Federal Savings & Loan Association, Plaintiff,**

v.

**LaSALLE NATIONAL BANK, etc., et al., Defendants.**

**AN ASSOCIATION OF FRANCISCAN FATHERS OF the STATE OF ILLINOIS, Defendant and Third Party Plaintiff,**

v.

**Milton N. ZIC, Third Party Defendant.**

**No. 86 C 10247.**

United States District Court, N.D. Illinois, E.D.

July 12, 1988.

James D. Murphy, P.C., Richard T. Ryan, Flynn, Murphy & Ryan, Chicago, Ill., for An Ass'n of Franciscan Fathers of the State of Ill.

Paul Hansfield, Chicago, Ill., for Milton N. Zic.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Firstsouth, F.A. ("Firstsouth") brought this action to foreclose on its mortgage on property in the Village of Oak Brook known as Whitehall Park. One of the defendants is An Association of Franciscan Fathers of the State of Illinois ("Franciscans" [1]), who hold a purchase money mort-

---

1. Franciscan clergy in Illinois are organized as an incorporated not-for-profit association. As a matter of English purity, Franciscans—a shorthand term for a singular noun (the defendant Association)—should be referred to in the singular. But that usage would strike the ear as awkward, for the natural shorthand references to the entity (whether "Franciscan Fathers" as used by the parties, or "Franciscans" as used in this opinion) sound in the plural. This opinion could, of course, obviate the problem by simply using "Association" (a collective noun calling

gage on the property from another defendant: LaSalle National Bank ("Bank") as trustee for an Illinois land trust, the beneficiary of which is Whitehall Park Development Corporation ("Development Corporation").

Franciscans have brought a third party complaint against Milton Zic ("Zic"), himself a principal of Development Corporation, seeking to recover on his personal guaranty (the "Guaranty") of the mortgage note. Franciscans have now moved for summary judgment on their third-party claim under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, the motion is granted and judgment is entered on behalf of Franciscans.

## Facts [3]

Zic is a developer who negotiated with Franciscans to purchase the former site of the St. Joseph Seminary in Oak Brook. On March 24, 1981 Franciscans entered into a written agreement (F.Ex. A, the "Agreement") to sell the property to Zic. Agreement ¶ 5.C required Zic to pay $900,000 on closing and give the Franciscans a $1.9 million purchase money mortgage. Zic retained the right to take title in a land trust, in which case he promised (1) to assign the beneficial interest in the trust to secure the note underlying the purchase money mortgage and (2) to guarantee the note personally (id. ¶ 5.C(ii)). Franciscans agreed to subordinate both the mortgage and the beneficial interest in the land trust to a construction loan not to exceed $10.5 million.

On September 1, 1982 Franciscans and Zic entered into an Extension Agreement (F.Ex. A–1) modifying the Agreement in several respects, in particular allowing until April 30, 1983 for closing (id. ¶ 1(c)). However, the Extension Agreement did not modify any term of the Agreement as to subordination of the anticipated purchase money mortgage to construction financing.

In early April 1983 Zic proposed that Franciscans agree to subordinate their mortgage to both a long acquisition loan and a construction loan "of an indefinite amount but probably not greater than $28 million" (F.Ex. E, an April 6, 1983 letter from L. Gray to J. Murphy). Franciscans agreed to subordinate to the land acquisition loan (Hartrich Aff. ¶ 7) but refused to subordinate to a construction loan larger than originally anticipated (Zic Aff. ¶ 8).

Closing of the sale occurred April 27, 1983. At that time Franciscans received a purchase money mortgage (more precisely, a trust deed) and Instalment Note in the principal sum of $1 million (F.Exs. B and C respectively). Their trust deed was a second lien on the seminary property, subject to a lien securing a $1,050,000 note from the Fairfax Savings Association for land acquisition (F.Ex. B ¶ 13). Development Corporation assigned the beneficial interest

for a singular verb form in customary usage). That however would depart from the most appropriate designation of the clerical order itself. This opinion therefore abandons purity in favor of referring to the Franciscans in plural terms (cf. May's Family Centers, Inc. v. Goodman's, Inc., 104 F.R.D. 112, 113 n. 1 (N.D.Ill.1985) (endorsing similar "cheating" when the most convenient shorthand usage is a possessive noun)). Franciscans' exhibits will be cited "F.Ex.—."

**2.** This case was assigned to this Court's calendar December 7, 1987, upon the retirement of Judge George Leighton. At that time the present disputants had just finished briefing this motion. At the request of all the parties, the principal case has been on hold pending the prospective settlement of the principal claim (the sole predicate for federal jurisdiction, which stems from FSLIC's having taken over as Firstsouth's receiver). It has been (and still is) expected that such

settlement, if it took place, would be followed by a remand to the state court where the case was originally brought. Then at the most recent (June 14, 1988) status conference, Franciscans (1) explained their concern that intervening creditors' claims against Zic might impair their position and therefore (2) asked for a ruling on their Rule 56 motion. This Court has addressed that motion as quickly as possible.

**3.** Rule 56 principles impose on the party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Zic (DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir.1987)).

in the land trust to Franciscans as collateral security for the Instalment Note (F.Ex. F). Finally, Zic personally guaranteed the Instalment Note as contemplated by the Agreement.

Development Corporation later formed a limited partnership, Whitehall Park Venture ("Venture"), in which another developer ("Wengroup" [4]) was a participant. Venture negotiated a construction loan with Firstsouth in the amount of $17.2 million (the "Firstsouth Loan"). Franciscans agreed to subordinate their trust deed to the Firstsouth Loan (F.Ex. L), purportedly at the express request of Zic (Hartrich Aff. ¶ 13). Zic does not specifically deny having requested Franciscans to agree to subordination, but he says the terms of that agreement were arranged by Wengroup (Zic Aff. ¶ 14).

Zic did sign the instructions to Bank to execute all the Firstsouth documents (F.Ex. L) in his capacity as President of Development Corporation. Zic also signed each of those documents for Venture, again in his capacity as President of Development Corporation, its general partner (F.Exs. H–J). Finally, Zic personally guaranteed the $17.2 million Firstsouth Loan (F.Ex. K).

Franciscans' Instalment Note came due in full on November 1, 1985 and has not been paid. Franciscans seek to enforce the Guaranty against Zic, who asserts he is not bound because Franciscans subordinated their security for the Instalment Note to the Firstsouth Loan, thereby changing his risk.

### Guaranty Principles and Their Application

■ One inference can be drawn with certainty from the just-completed factual narrative: Zic is not lacking in gall. He seeks to avoid the terms of the Guaranty because he did not explicitly agree to Franciscans' subordinating their collateral for the Instalment Note to the Firstsouth

Loan. Of course he does not say he did not know Franciscans were going to do so, because he most assuredly did know that. Nor is it possible to give serious consideration to the notion that Zic would have refused to approve the subordination if asked to do so. After all, he personally guaranteed the $17.2 million Firstsouth Loan, compared to which the incremental risk to him from the Franciscans' action in subordinating to the selfsame loan is near-trivial. Given Zic's very substantial stake in having the Whitehall Park project go forward,[5] it is inconceivable that he would have balked at explicitly approving the Franciscans' action.

Distaste for Zic's business ethics does not, however, justify judgment against him. His legal arguments must be addressed on their own terms. Those too deserve short shrift.

*Bernardi Bros., Inc. v. Great Lakes Distributing, Inc.,* 712 F.2d 1205, 1207 (7th Cir.1983), quoting *Claude Southern Corp. v. Henry's Drive–In, Inc.,* 51 Ill.App.2d 289, 299–300, 201 N.E.2d 127, 132 (1st Dist. 1964), has described one basic tenet of the Illinois law of guaranty:

> It is fundamental that "a guarantor is not liable for anything which he did not agree to and if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guaranty, the guarantor shall be released."

Any change in the agreement between creditor and principal that increases the guarantor's risk is likely to be found material (*Bernardi Bros., id.*).

Creditors are expected to protect and preserve collateral, and failure to take reasonable care to do so discharges the guarantor. Thus the guarantor in *North Bank v. Circle Investment Co.,* 104 Ill.App.3d 363, 369–70, 60 Ill.Dec. 105, 108–09, 432 N.E.2d 1004, 1007–08 (1st Dist.1982) was released when the creditor failed to perfect its security interest in the beneficial inter-

---

**4.** Zic Aff. ¶ 12 describes Wengroup as a group of companies controlled by Sidney Weniger, a successful New York developer.

**5.** Not only was Zic the President of Development Corporation, the general partner of Venture, but he was also a principal of the project's architect and contractor, Milton N. Zic Associates (see F.Exs. M and N).

est in a land trust held as collateral for the underlying debt. It is only a small step from a creditor's failure to perfect a security interest in collateral to a creditor's subordination of that security interest to a substantially larger higher-priority security instrument than was contemplated by the original guaranty instrument.[6] Thus Franciscans' action in subordinating the Instalment Note to the Firstsouth Loan would clearly be a material change sufficient to discharge Zic.

But it has long been settled that a guarantor is not discharged "where the guarantor has knowledge of and assents, either expressly or by implication, to such change" (*Lawndale Steel Co. v. Appel,* 98 Ill.App.3d 167, 172, 53 Ill.Dec. 288, 293, 423 N.E.2d 957, 962 (2d Dist.1981), citing *Bank of Commerce v. Riverside Trails,* 52 Ill. App.3d 616, 620–21, 10 Ill.Dec. 384, 388, 367 N.E.2d 993, 997 (2d Dist.1977)). *Lawndale Steel, id.* 98 Ill.App.3d at 173, 53 Ill.Dec. at 293, 423 N.E.2d at 962, teaches a guarantor's knowledge of a change, coupled even with mere silence regarding the guaranty, is enough:

> Under the rule of *Riverside Trails,* the overwhelming evidence of Appel's knowing acquiescence to this alteration over the course of almost a year bars his later objection.

There Appel had not signed the amendment and testified he could not remember seeing it—yet the clear evidence that he had been continuously involved in all details of the transactions was sufficient to prevent discharge of his guaranty (*id.* at 169, 53 Ill. Dec. at 290, 423 N.E.2d at 959). Similarly, in *Alton Banking & Trust Co. v. Sweeney,* 135 Ill.App.3d 96, 103, 89 Ill.Dec. 926, 931, 481 N.E.2d 769, 774 (5th Dist.1985) the guarantor was aware of any changes that affected her level of risk and made no effort to revoke her guaranty.

Beyond peradventure Zic knew Franciscans were going to subordinate their trust deed and Instalment Note before they did so, and at a minimum he raised no objection.[7] Under *Lawndale Steel* and *Alton Banking,*[8] the Guaranty is clearly not discharged. Zic's assertion that he signed the various Firstsouth Loan documents only in his capacity as President of Development Corporation is wholly beside the point. His signature is nonetheless conclusive evidence of his knowledge of the changes—it is irrelevant whether he signed while wearing his corporate hat or his personal hat.

All this discussion is really obvious, even intuitive, and Zic ignores the common-sense body of Illinois law rather than attempting to address it. Instead Zic seeks to read the Guaranty as though it explicitly required his written approval of any change in the underlying debtor-creditor relationship. Zic's argument is apparently this:

1. His Guaranty "incorporates" the Agreement.

2. All the Agreement calls for from Franciscans is that they subordinate their security to a construction loan not to exceed $10.5 million.

3. Finally, the Agreement (and hence [sic] the Guaranty) allows either party to waive terms of the Agreement only in writing (see Agreement ¶ 21.G).

Zic's "analysis" fails at every step.

First, the Guaranty does not "incorporate" the Agreement in any ordinary sense of that term. True enough, the section of the Guaranty labeled "Recitals" refers several times to the Agreement or its terms, but nowhere does the Guaranty say the Agreement is part of the Guaranty itself.

---

**6.** It is of course possible to imagine circumstances where subordination to a larger construction loan would actually *decrease* the risk to the guarantor. Indeed that may very well have seemed to be the situation here. Franciscans have not attempted such a showing, though (as would be their responsibility on this motion), and in any case the guarantor (and not the creditor acting unilaterally) should be allowed to decide whether he believes his risk will be reduced by the change.

**7.** "At a minimum" is a deliberately-chosen phrase; see Appendix.

**8.** Both sides have understandably—and correctly—treated Illinois substantive law as controlling. All aspects of the controversy are Illinois-based: the location of the real estate, the home base of both disputants, the situs of the lenders, the negotiation and execution of the documents at issue—and the list could go on.

Thus it would strain language beyond its normal meaning to treat the limitation in Agreement ¶ 21.G as somehow incorporated by reference into a Guaranty that is wholly silent on the subject of amendment or waiver.

Second, it is correct—but not material for current purposes—that the Agreement's requirement of Franciscans' subordination of their mortgage is limited to a $10.5 million construction loan. Of course that subordination requirement was a duty Franciscans owed to Zic, and the Agreement would allow him to waive that requirement in writing. But the $10.5 million limitation on the duty to subordinate was obviously for *Franciscans'* primary protection and benefit, not Zic's. They effectively waived that protection in writing when they consented to Zic's direction to Bank as trustee to execute the documents for the much larger loan.[9]

■ Finally, even if the Agreement were read to require Zic to waive the subordination limitation in writing, and even if that requirement were read into the Guaranty,[10] it would provide little benefit to Zic. Illinois follows the general rule that despite a contract provision requiring modifications to be in writing, the contract may be modified by an oral agreement—essentially a rule that the contract requirement of written modification can itself be modified orally (see, e.g., *Estate of Kern*, 142 Ill.App.3d 506, 514, 96 Ill.Dec. 815, 820, 491 N.E.2d 1275, 1280 (1st Dist.1986)). Here Zic's affidavit does not explicitly deny his agreement to the subordination. Even so, with the pro-Zic inferences that are required on this motion (see n. 3) it might perhaps be concluded that his subjective intent was not to agree. Nevertheless it is not Zic's subjective intent that controls, but rather the objective manifestations of his intent. On that basis no rational factfinder could conclude Zic did not approve of the modification.

All in all, there is no doubt Franciscans are entitled to judgment on the Guaranty. Zic has not challenged their calculation of the amount due. Hartrich Aff. ¶ 14 sets that amount at $2,877,572.60 as of September 30, 1987 plus $624.66 per day thereafter. This Court therefore calculates the additional interest accrued as of July 12, 1988 as $178,652.76, calling for entry of judgment in the amount of $3,056,225.36.

### Conclusion

Franciscans have shown there is no disputed issue of material fact and they are entitled to a judgment as a matter of law. Judgment is accordingly ordered entered for Franciscans and against Zic for $3,056,-225.36. Moreover, Franciscans' claim is entirely severable from the still-pending aspects of the litigation, and there is no reason their efforts to collect from Zic should be deferred—really held hostage—while the other disputes hang fire (see *National Metalcrafters v. McNeil*, 784 F.2d 817, 821 (7th Cir.1986)). This Court therefore expressly directs entry of final judgment in Franciscans' favor against Zic, having expressly determined that there is no just reason for delay (see Rule 54(b)).

### APPENDIX

As the text reflects, Franciscans are entitled to summary judgment even on the undisputed premise that Zic was fully aware of, and raised no objection to, the increased subordination of the debt secured by his guaranty. But that really puts the worst face on things from Franciscans' point of view—even beyond the necessary reasonable factual inferences in Zic's favor (see n. 3 to the text of this opinion). Zic is in an even less tenable position than that set of facts would suggest, and this Appendix will elaborate briefly on the subject.

Franciscans also say (Hartrich Aff. ¶¶ 5–6) it was Zic himself who apprised them of the need for the considerably larger construction loan and requested the re-

---

**9.** Of course the Guaranty gave Zic an interest in the subordination limitation too, but nothing in the Guaranty itself says he had to waive that in writing. As already shown, under Illinois law his knowledge and silence were enough.

**10.** As already indicated, there is no justifiable basis for either of those assumptions—even purely arguendo.

vised subordination. Indeed the letter to Franciscans' lawyer from a lawyer in the Lord, Bissell & Brook firm,[1] in which the Lord, Bissell lawyer confirmed both (1) those matters and (2) the need for subordination "to a land acquisition loan and to a subsequent construction loan of an indefinite amount but probably not greater than $28 million," consistently refers to "my client, Milton N. Zic" and to Zic individually as having "requested certain minor (sic) concessions from your client in order that he can properly complete such negotiations" (F.Ex. E). That letter clearly portrays Zic as *the* prime player in the piece. And Zic's responsive affidavit to Franciscans' present motion is obviously carefully tailored to avoid a specific admission on that score:

1. Zic Aff. ¶ 7 does confirm that the proposal to Franciscans for the expanded development plan, which in turn required the much larger financing amount, originated with Zic.

2. Though Zic Aff. ¶ 8 asserts Franciscans "rejected his proposal for an expansion to the development plan and insisted upon strict adherance [sic] to the original construction loan limitation of $10,500,000," Zic Aff. ¶ 11 says:

> That, as president of WHITEHALL PARK, he [Zic] engaged a broker for the purpose of locating a construction lender to provide funding for development of the project and, late in 1983, an application was submitted to First-South Federal Savings & Loan Association.

All that being true, it must be viewed as more than a bit disingenuous for Zic to stress at this point that Weniger negotiated the enlarged construction loan with First-south (Aff. ¶ 15), that Wengroup arranged the terms of increased subordination (*id.* ¶ 16) and that Zic's participation in that transaction was in his capacity as an officer of Whitehall Park (Venture's general partner). Even with reasonable inferences

in Zic's favor, as Rule 56 mandates, the increased subordination still has to be recognized as having been induced by Zic (even if not arranged by Zic alone) for what he perceived as a purpose beneficial to himself.

Whether that set of facts might be characterized as raising an estoppel in legal terms or simply as evidencing Zic's approval of the increased subordination, it surely negates his discharge as guarantor. And of course that spells victory for Franciscans—really on an a fortiori basis from the facts stated in the text. Again it should be stressed, however, that Franciscans must win and Zic must lose even without the analysis set out in this Appendix.

---

1. That law firm is not representing Zic in the current litigation. There is thus no reason to believe that firm, after having launched the efforts on Zic's behalf to get Franciscans' agreement to impair their own priority, would have had the nerve to advance the arguments made by Zic's present counsel. Everyone is familiar with the old joke about the defendant who, having murdered his parents, invokes the court's mercy because he is an orphan.