(No. 68075.—

WATSEKA FIRST NATIONAL BANK, Appellant, v. FRANK RUDA *et al.*, Appellees.

*Opinion filed February 16, 1990.—Rehearing denied April 9, 1990.*

142

Robert R. Watson and Melville W. Washburn, of Sidley & Austin, of Chicago, and Frank J. Simutis, of Ackman, Marek, Boyd & Simutis, Ltd., of Watseka, for appellant.

Ronald E. Boyer, of Boyer & Thompson, Ltd., of Watseka, for appellees.

JUSTICE RYAN delivered the opinion of the court:

Watseka First National Bank (Watseka Bank) filed suit on January 5, 1984, against Ken L. Ward as principal debtor and Patti Ward, Frank Ruda and Virginia Ruda, guarantors, seeking to recover the balance on two notes. The Wards were dismissed from this action after they were adjudicated bankrupt. The trial court awarded judgment on the notes in the amount of $186,322.97 with interest and costs. The appellate court reversed, holding that, under an objective standard, the bank failed to act in good faith in accelerating the debt, according to the terms of an insecurity clause, and that this failure to act in good faith discharged the Rudas from their liability as sureties. (175 Ill. App. 3d 753, 757.) We granted Watseka Bank's petition for leave to appeal (107 Ill. 2d R. 315). We reverse the appellate court.

This lawsuit involves two promissory notes, both dated May 2, 1983. These notes evidenced Ward's indebtedness to Watseka Bank arising out of the bank's funding of Ward's farming operations. The first was termed a "renewal of capital note" that renewed loans, the proceeds of which Ward used to purchase farm equipment.

The note in the amount of $125,000 was due March 27, 1984. The second was termed an "on call line of credit" that was to be used for operating expenses. It was in the amount of $121,000, $45,704.34 of which was a carry-over from the preceding year, and was also to mature March 27, 1984. Both notes were secured by Ward's "farm machinery, equipment, feed, [and] crops on hand and growing," more particularly described in an accompanying security agreement. The notes were signed by Ken L. Ward alone. These notes were also accompanied by personal, unlimited guarantees signed by Frank Ruda, Virginia Ruda and Patti Ward.

The execution of these notes was not the first transaction involving these parties. According to Ken Ward's testimony, the bank first began loaning money to him in 1973, two years after he began to farm. Throughout the years leading up to this litigation, Watseka Bank financed Ward's farming operation. Ward repaid the bank, with varying degrees of success, out of the proceeds of his farming operation.

Ward did not own the land that he farmed but, rather, he leased it. He began farming land owned by the Rudas, his parents-in-law, in 1981. Ward paid the Rudas rent, both in cash and on a crop-share basis, at different points during the time he farmed their land. Ward also had a partner named Robert Taylor with whom he apparently shared the proceeds of his operations. The Iroquois First State Bank had also loaned Ward money and it too held a security interest in Ward's crops.

In July of 1981, with his total line of credit at $145,005.90 and the prospect of a loan from the Farmers Home Administration questionable, Ken Ward and Watseka Bank discussed the possibility of obtaining a guarantee from the Rudas, in order for the bank to be able to continue financing Ward's operation. The bank

told Ward to obtain Frank Ruda's current financial statements. After discussing the matter with a representative of another bank, according to Watseka Bank's internal memoranda, it found that Frank Ruda did not qualify as a cosigner and that his character was "very questionable." The bank, however, after reviewing the Rudas' financial statements, considered the Rudas' reported equity in their farm property of over $2 million sufficient to guarantee the Ward indebtedness and, based on these guarantees, the bank made additional advancements.

During the next two years Ken Ward continued to borrow money and pay back portions out of the proceeds of his farming operation. His financial condition did not improve during this time, however, and it in fact worsened. The bank concluded, in February of 1983, that "[i]f it were not for Frank and Virginia Ruda's guarantee, we would probably not be loaning Ward any money."

In April of 1983, Frank Ruda submitted then current financial statements reflecting a net worth of over $2 million. According to the bank's memoranda, it suspected that this figure was overstated but felt that the Rudas' net worth was approximately $1½ million. Based on the Rudas' net worth, and despite previous cash-flow problems with both Frank Ruda and Ken Ward, the bank restructured and extended Ward's debt, culminating in the notes that are the subject of this lawsuit. These notes contained the following language: "If the holder deems itself insecure then at its option, without demand or notice of any kind, it may declare this note to be immediately due."

The ensuing summer of 1983, unfortunately, was not a kind one for Illinois farmers. A severe drought greatly affected the crops, and as a result, Ken Ward realized yields far below that which he projected. In October of that year, a meeting was held between Ken Ward, Frank Ruda, officers and attorneys of Watseka Bank and repre-

sentatives of Iroquois First State Bank. The parties apparently agreed that, because the proceeds from the sale of Ken Ward's crops would not be sufficient to satisfy his indebtedness to the banks, Frank Ruda would have to sell some of his farmland and apply the proceeds to the various notes. Attorneys for Watseka Bank prepared lease terminations for the land Ward was renting from Ruda to facilitate the sale of that property. Ward soon began to sell the personal property that served as security for the debt and applied the proceeds to the debt.

Frank Ruda evidently was not pleased with these arrangements and actively avoided any contact with Watseka Bank for the following two months. In early December of that year, attorneys for Watseka Bank sent Frank Ruda a letter informing him that the bank would take legal action if he did not sell the farms and apply the proceeds to the debt. The bank's memoranda indicate that, having received no response, it exercised the confession of judgment clause on the notes in late December. The bank actually filed its complaint against all four defendants on January 5, 1984, approximately three months prior to the stated maturity date, alleging that the notes were due pursuant to the insecurity clauses.

Watseka Bank alleged that Ward was liable as debtor under the promissory notes, and alleged that the Rudas and Patti Ward were liable pursuant to the unlimited guarantees that they signed in 1981. The defendants set forth several affirmative defenses with their answer, including want of consideration and fraud in inducing the Rudas to sign the unlimited guarantees for the Ward indebtedness, failure by the bank to provide adequate notice of the sale of collateral pursuant to section 9—504(3) of the Uniform Commercial Code (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(3)) (U.C.C. or Code), and breach of a fiduciary duty. The issue of plaintiff's failure to act in good faith in accelerating the debt appears to have first

been raised in defendants' opening statement. Any procedural error that might have arisen from this method of raising this issue is inconsequential, however, because no objection appears in the record, counsel later argued the merits of the defense and the judge ruled on it. *Truchon v. City of Streator* (1979), 70 Ill. App. 3d 89, 94.

The trial judge ruled in favor of the plaintiffs as to all matters, except for the defendants' allegation regarding plaintiff's failure to accelerate in good faith. The trial judge, nevertheless, awarded to plaintiff judgment on the notes, but ordered counsel to recalculate the amount owing on the notes because the court determined that the bank inappropriately applied the proceeds from the sale of the collateral to the indebtedness before the maturity date stated on the notes.

The judge's specific finding was that Watseka Bank "had no basis for accelerating the maturity date on the notes," but he refused to discharge the Rudas' liability as sureties because, at the time of trial, the stated maturity date on the notes had come and gone. It is not clear what standard the judge used for either of these decisions and the attorneys' memoranda of points and authorities shed little light on the question.

On appeal, the Rudas argued that the bank failed to act in good faith pursuant to section 1—208 of the Code (Ill. Rev. Stat. 1987, ch. 26, par. 1—208), and that the bank failed to provide proper notice of the sales of the collateral pursuant to section 9—504 of the Code (Ill. Rev. Stat. 1987, ch. 26, par. 9—504). Addressing only the first issue, the appellate court concluded that "the trial court's failure to find an absence of good faith in the acceleration of the due date of Ward's debt was contrary to the manifest weight of the evidence." (175 Ill. App. 3d 753, 757.) The appellate court also concluded that the bank's improper acceleration of the debt materially altered the Rudas' principal obligation, thereby re-

leasing them from that obligation. While it is also unclear whether the appellate court properly characterized the trial judge's findings, neither court, in our view, articulated the proper standard that should be applied to the facts in this case.

In this appeal Watseka Bank argues that the appellate court (1) incorrectly termed the test under section 1—208 as objective, (2) erred, in any event, in finding a lack of good faith, (3) erred in finding that the bank's acceleration of the notes served to release the Rudas from their guarantee liability, and (4) failed to properly find that the language of the Rudas' guarantees indicated a waiver of any defense based on wrongful acceleration. Because we find in favor of Watseka Bank as to the first two issues, we need not address the final two. We will discuss the Rudas' contention on cross-appeal later in this opinion.

The insecurity clauses, which provided the basis for the bank's acceleration of these notes, are specifically addressed in the Uniform Commercial Code (U.C.C.). Section 1—208 states as follows:

> "A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised." (Ill. Rev. Stat. 1987, ch. 26, par. 1—208.)

This Code section specifically permits the use of insecurity clauses, but allows creditors to exercise them only if they do so in good faith. There has been considerable debate, however, concerning what the term "good faith"

means and whether it is properly measured subjectively or objectively.

The term "good faith" appears repeatedly in the U.C.C. Section 1—203 states that every contract or duty within the scope of the Code has an obligation of good faith. (Ill. Rev. Stat. 1987, ch. 26, par. 1—203.) Other Code sections, such as 1—208, and several within articles 2 and 3, specifically identify the obligation of the parties to act in good faith. Just what the term means, however, remains somewhat of a mystery. Its meaning, moreover, may change, depending upon the context in which it is used.

The concept of "good faith," under the Code, has been the subject of continued debate among the commentators. One has argued that the term "good faith" has no independent meaning, and can only be determined by excluding that which can be identified as "bad faith." (Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va. L. Rev. 195 (1968).) Another author criticizes this approach and concludes that, in order to learn what "good faith" means, "we need to consider the purposes that the concept serves in legal discourse." (Patterson, *Wittgenstein and the Code: A Theory Of Good Faith Performance and Enforcement Under Article Nine*, 137 U. Pa. L. Rev. 335, 371 (1988).) Another commentator traces the origin of the term as it became codified in the Code and identifies a distinction between "good faith purchase" and "good faith performance." Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code*, 30 U. Chi. L. Rev. 666 (1963).

In the article by Professor Patterson cited above, it is suggested that "good faith," as used in article 1 of the Code, implies a subjective standard, whereas that term, as used in article 2, implies an objective standard. Sec-

tion 1—201(19) defines good faith as follows: " 'Good faith' means honesty in fact in the conduct or transaction concerned." Whereas section 2—103(1)(b) defines good faith as follows: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The 1950 draft of the Code did not contain a separate standard of good faith for merchants. In that draft, the good faith definition in article 1, in addition to the honesty in fact definition it now contains, also included the reasonable commercial standards provisions now found in article 2. From this difference in language and the history of the development of the Code, commentators have concluded that, as used in article 1, good faith is to be determined by a subjective test, whereas in article 2 that term implies an objective test. (137 U. Pa. L. Rev. at 380-81.) As it presently appears in the Code, section 1—208, which provides that a party may accelerate only if he, in "good faith," believes the prospect of payment or performance is impaired, is governed by the definition of "good faith" as defined in article 1. "[H]onesty in fact in the conduct or transaction concerned," as noted, the definition in article 1, makes no mention of the commercial reasonableness standard. (Ill. Rev. Stat. 1987, ch. 26, par. 1—201(19).) We construe this to mean that section 1—208 permits a creditor to accelerate a debt pursuant to an insecurity clause if that creditor has an honest belief, based on whatever information it has, that the ability of the debtor to repay the debt has in some way become impaired.

This test, which at least one court has termed "the pure heart and empty head" test, appears potentially draconian "because of the great latitude it gives the creditor and the onerous burden of proof it imposes on the debtor." (*Black v. Peoples Bank & Trust Co.* (Miss. 1983), 437 So. 2d 26, 29.) While the debtor's burden of

proof may be difficult because the debtor must delve into the creditor's state of mind, the burden is not impossible. That is, the debtor may successfully establish lack of good faith by proving that the creditor did not have possession of the information that the creditor contends caused the acceleration. (Comment, *Standards For Insecurity Acceleration Under Section 1—208 Of The Uniform Commercial Code: A Proposal For Reform*, 13 U. Mich. J.L. Ref. 623, 642 (1980).) Similarly, the debtor can establish that the creditor had possession of the information that it asserts caused it to accelerate at the time the loan was made and, as such, the creditor cannot honestly feel less secure than it did when the loan was made.

The severity of recognizing the subjective test contemplated by section 1—208 while at the same time placing the burden of proof on the debtor to establish the creditor's subjective lack of good faith, as that section also requires, is tempered by other Code sections. For instance, section 1—103 allows courts to supplement the U.C.C. with common law principles and equity where the Code does not specifically displace them. (Ill. Rev. Stat. 1987, ch. 26, par. 1—103.) Additionally, the general obligation of good faith found in section 1—203 is "further implemented by [s]ection 1—205 on course of dealing and usage of trade." (Ill. Ann. Stat., ch. 26, par. 1—203, Uniform Commercial Code Comment, at 58-59 (Smith-Hurd 1963).) While these provisions do not go as far as measuring a creditor's actions by a "reasonable accelerator" standard, they do insure that a creditor will not be permitted to accelerate in a manner that is contrary to an established course of performance or course of dealing between the parties, in violation of the clear intention of the parties, or in a manner that is inconsistent with the express practices of the industry.

An obligation to act in a commercially reasonable manner, however, is clearly not a part of section 1—208. As noted, while this requirement may have appeared in early drafts of article 1, it ultimately made its way only into article 2 of the U.C.C. (30 U. Chi. L. Rev. at 673.) We must conclude that the drafters did so purposely, finding perhaps that inclusion of the "commercially reasonable" standard for acceleration would detrimentally affect the cost and availability of credit, and that this outweighed any potential for abuse that the provision posed.

The question of whether a particular creditor has in fact acted in good faith provides the focus of litigation involving section 1—208. Most courts that have addressed the issue have determined that the test of good faith is subjectively measured. These courts have determined that a creditor acts properly in exercising an insecurity clause so long as it does so honestly, irrespective of whether it acts reasonably. *Quest v. Barnett Bank* (Fla. App. 1981), 397 So. 2d 1020; *Builders Transport, Inc. v. Hall* (1987), 183 Ga. App. 812, 360 S.E.2d 60; *Ginn v. Citizens & Southern National Bank* (1978), 145 Ga. App. 175, 243 S.E.2d 528; *Farmers Cooperative Elevator, Inc. v. State Bank* (Iowa 1975), 236 N.W.2d 674; *Van Bibber v. Norris* (1981), 275 Ind. 555, 419 N.E.2d 115 (apparently applying a subjective test); *Karner v. Willis* (1985), 238 Kan. 246, 710 P.2d 21; *Fort Knox National Bank v. Gustafson* (Ky. 1964), 385 S.W.2d 196; *Rigby Corp. v. Boatmen's Bank & Trust Co.* (Mo. App. 1986), 713 S.W.2d 517; *Salsbery v. Ford Motor Credit Co.* (1981), 54 Or. App. 522, 635 P.2d 669; *Van Horn v. Van De Wol, Inc.* (1972), 6 Wash. App. 959, 497 P.2d 252.

Several other courts, however, have chosen to impart an objective element into the test of whether a creditor has acted in good faith in accelerating a debt. In *Kupka*

*v. Morey* (Alaska 1975), 541 P.2d 740, 747, the Alaska Supreme Court held that, in order to enforce an insecurity clause, "the party invoking the clause must reasonably and in good faith believe that the prospect of payment or performance has somehow been impaired." In support of this conclusion, the court looked to article 2, and cited *Sheppard Federal Credit Union v. Palmer* (5th Cir. 1969), 408 F.2d 1369. The *Sheppard* court came to the following conclusion:

> "In his excellent treatise on security interests, Professor Gilmore indicates that the language of UCC § 1—208 means in substance that '[t]he creditor has the right to accelerate if, under all the circumstances, a reasonable man, motivated by good faith, would have done so.' " (408 F.2d at 1371 n.2, quoting 2 G. Gilmore, Security Interests in Personal Property §43.4, at 1197 (1965).)

We must disagree with the professor's conclusion on this question. There appears to have been some debate as to whether the standard of commercial reasonableness would become part of section 1—208. Professor Gilmore might even have been a proponent of such a standard when the Code was being drafted. The absence of such a standard in section 1—208, however, is conspicuous. We are not able to insert such a provision where the drafters chose to leave it out.

A Colorado court, in *Richards Engineers, Inc. v. Spanel* (Colo. App. 1987), 745 P.2d 1031, also concluded that the proper test under section 1—208 is whether a reasonable person, under the same circumstances, would have accelerated. It also relied upon Professor Gilmore's treatise as well as section 1—201 of the U.C.C., which states that the definitions, including the definition of "good faith," apply only if the context in which they are used does not require otherwise. (*Richards*, 745 P.2d at 1032.) We are not convinced, as was this Colorado appellate court, that the context of an insecurity clause man-

dates that we abandon the definition provided in article 1, which is also the definition to which section 1—208 is specifically cross-referenced in the Uniform Commercial Code comment. (See Ill. Ann. Stat., ch. 26, par. 1—208, Uniform Commercial Code Comment, at 80-81 (Smith-Hurd 1963).) This Colorado appellate court also expressed concern for the "inequity of a purely subjective standard." (*Richards*, 745 P.2d at 1033.) Equity, however, although a legitimate concern in this area, is something that must be decided on a case by case basis and cannot appropriately provide the basis for adopting a general rule of law that is contrary to the clear meaning of the statute.

The defendants cite an Indiana appellate court case. (*Universal C.I.T. Credit Corp. v. Shepler* (1975), 164 Ind. App. 516, 329 N.E.2d 620.) In *Universal*, the court concluded that "to be in good faith the creditor must make a diligent and honest effort to discover from all available sources that the security is greatly impaired." (*Universal*, 164 Ind. App. at 521, 329 N.E.2d at 623.) While this might be the best rule, it is simply not the rule that the Code drafters adopted. The *Universal* court also stated that adoption of the subjective test would render section 1—208 meaningless. We disagree. While the burden on the debtor is great, it is not insurmountable. Because of the safety nets provided by sections 1—103 (applicability of principles of equity) and 1—203 (general requirement of good faith in performance and enforcement of contract or duty which is broader than good-faith requirement of section 1—208), courts have the opportunity to refuse to enforce accelerations that are purely arbitrary or baseless. We also note that the persuasive value of *Universal* is suspect considering the Indiana Supreme Court opinion in *Van Bibber v. Norris* (1981), 275 Ind. 555, 566, 419 N.E.2d 115, 122, which stated the following:

"We note, however, that the absence of a similar burden of observing 'reasonable commercial standards' on a secured party reflects the Code drafters' recognition that sales transactions are more amenable to establishment of 'reasonable commercial standards' than are the relations between secured parties and debtors."

The Mississippi Supreme Court, citing *Universal,* Professor Gilmore's treatise and its own pre-Code law, also concluded that a creditor's belief that the prospect of payment has been impaired must be reasonable. (*Black v. Peoples Bank & Trust Co.* (Miss. 1983), 437 So. 2d 26, 29.) The supreme court of Oklahoma came to the same conclusion, citing Professor Gilmore's treatise in a footnote. *Mitchell v. Ford Motor Credit Co.* (Okla. 1984), 688 P.2d 42, 45 n.5.

The author of a well-known general treatise on the U.C.C. has criticized this line of cases. (1 R. Anderson, Uniform Commercial Code §1—208:47 (3d ed. 1981).) This author states that the confusion stems from the fact that there is a pseudo-objective element to which courts look when determining the credibility of the creditor's assertion that it felt that the security had become impaired:

"As a practical matter, it can be expected that there is a theoretical breaking point and that the trier of fact will reach the conclusion that the non-merchant did not honestly believe when the circumstances are such that the trier does not think that any reasonable person could have possibly believed as the non-merchant claims to have believed." (1 R. Anderson, Uniform Commercial Code §1—208:47, at 463 (3d ed. 1981).)

Indeed, the question of whether a witness is credible is always an issue to be determined by the trier of fact. The proper inquiry, however, is whether the secured party acted honestly, not whether the secured party acted reasonably.

A popular U.C.C. hornbook, however, concludes differently, stating as follows:

"Since 1—208 requires only that the secured party act in 'good faith' ('honesty in fact'), the Code standard seems to lie somewhere between a strict objective test (reasonable prudent man) and a thoroughly subjective one (whim). The draftsmen apparently intended an objective standard." (J. White & R. Summers, Hornbook on the Uniform Commercial Code §25—3, at 1192 (3d ed. 1988).)

These authors also conclude, interestingly, through analyzing several of the cases in this area, that it makes little difference which test prevails because the question whether the creditor acted in good faith in accelerating a debt is answered the same way regardless of whether the test is termed subjective or objective.

We conclude that a purely objective test of reasonableness was not intended to be applied to the question of whether a secured party has a good-faith belief that the prospect of payment or performance has become impaired. We likewise conclude that a moderating influence brought to bear on section 1—208 by sections 1—103 and 1—203, and the incorporation into the definition of good faith of the honesty in fact in the conduct or transaction concept of section 1—201, prevents an arbitrary or capricious exercise of the power to accelerate the maturity of an instrument. Although we adhere generally to the belief that section 1—208 incorporates a subjective rather than an objective test, we find that because of the effect of the other sections mentioned, the test is not purely subjective. A certain amount of objectivity is involved in ascertaining the honesty in fact concept of good faith. This requirement insists that the desire to accelerate be based on more than the mere whim of the obligee.

Officers of Watseka Bank stated, at trial, that the reason it accelerated these notes was because it became obvious that Ward would have an insufficient cash flow,

due to the small yields caused by the drought, to pay the installments on the operating loan and the capital debt. Ward's inability to meet his obligation is, apparently, not in dispute. While Watseka Bank might have had knowledge of Ward's historically poor cash flow, and the interests of Iroquois First State Bank and Robert Taylor, when it made the loan, it did not know that there would be a drought, with the resulting decreases in yields of the crops. Additionally, the Rudas, who were the guarantors, refused to cooperate after the meeting with the bank officials in October 1983. They did not take steps to liquidate farmland to raise funds to apply to the debt, as was discussed at that meeting. The Rudas also affirmatively avoided all contact with the bank. Although the Rudas' net worth may well have been sufficient to liquidate the obligation, from the Rudas' lack of cooperation there was reason for the bank to honestly believe that their farmland would not voluntarily be sold so that the obligation could be paid at maturity. The Rudas did not offer any evidence that the bank did not possess this information when it decided to accelerate the debt, or that the bank had this information when it chose to make the loans. In fact, the evidence is to the contrary. As such, the bank must prevail under the subjective test articulated here.

We are cognizant of the fact that the rule set forth in this case, that a creditor acts in good faith when exercising an acceleration clause so long as it acts honestly, irrespective of whether the "reasonable creditor" would have accelerated under the same circumstances, has a potential for abuse. We assume, however, that the Code drafters were also aware of this potential when they excluded from section 1—208 the duty to act in a commercially reasonable manner. While several courts in other jurisdictions have found unique ways to incorporate an objective element into the test of good faith (see *Blaine*

*v. G.M.A.C.* (1975), 82 Misc. 2d 653, 370 N.Y.S.2d 323 (two-tiered test)), we choose rather to follow the majority of jurisdictions that apply the statute as it is written.

In light of this debate, there is no question that the Code drafters could have done a better job composing section 1—208. In fact, the entire concept of good faith as it appears in the U.C.C. is in need of clarification. The fact that courts and commentators have strikingly divergent views of what the term "good faith" means in section 1—208, and in other parts of the Code, is "antithetical to the idea of a *uniform* commercial code." (Emphasis in original.) (13 U. Mich. J.L. Ref. at 644.) Inconsistency and lack of clarity may unfortunately be the inevitable consequence of a statute that was subject to extreme lobbying efforts and was the result of political compromise. Reform, however, will have to come from the legislature, not this court.

Because there is no evidence in the record in this case that Watseka Bank did not actually possess the information it claims caused it to accelerate, or that Watseka Bank actually possessed the information it asserts caused it to accelerate at the time it made the loans, the inevitable conclusion is that the Rudas have failed to establish a lack of good faith. As such, we must reverse the appellate court as to this issue. The findings of the circuit court are unclear, however, and, in any event, it must determine the proper judgment amount in light of this opinion. We therefore remand this cause to the circuit court for further proceedings consistent with this opinion.

Defendants argue on cross-appeal that they were entitled to notice of the sale of the collateral pursuant to section 9—504(3) of the Code (Ill. Rev. Stat. 1987, ch. 26, par. 9—504(3)). This section requires that the secured party provide notice to the debtor, which includes a guarantor (*Commercial Discount Corp. v. Bayer* (1978),

57 Ill. App. 3d 295, 299), of the details of the disposition of the collateral. We concur with the logic of the appellate court in *Midwest Bank & Trust Co. v. Roderick* (1985), 132 Ill. App. 3d 463, 468, which held that the notice provision in section 9—504 pertains only to dispositions that the *secured party* effects. We hold, in the present case, that the trial court's conclusion that the debtor, Ken Ward, sold the property himself, not the bank, is not contrary to the manifest weight of the evidence.

For the reasons stated, the judgment of the appellate court is reversed, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the circuit court of Iroquois County.

*Appellate court reversed; circuit court*
*affirmed in part and reversed*
*in part; cause remanded.*