**CONTINENTAL BANK N.A.,**
Plaintiff–Appellee,

v.

**Sheldon MODANSKY and Aaron Modansky, Defendants–Appellants.**

No. 92–2666.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1993.

Decided June 23, 1993.

310

David M. Schiffman (argued), Kate Poverman, Sidley & Austin, Chicago, IL, for plaintiff-appellee.

Sarah R. Wolff, Sachnoff & Weaver, Chicago, IL, Leonard Zack (argued), Zack & Associates, New York City, for defendants-appellants.

Before BAUER, Chief Judge, and POSNER and COFFEY, Circuit Judges.

BAUER, Chief Judge.

Continental Bank sued Ajayem Investors Corporation and brothers Aaron and Sheldon Modansky (collectively "the guarantors") for breach of contract after they failed to compensate Continental for loans they had guaranteed on behalf of four Ajayem lumber companies that filed for bankruptcy. Continental brought this lawsuit in the district court under diversity jurisdiction. 28 U.S.C. § 1332. The case was presented to a jury, but the district court directed a verdict in Continental's favor pursuant to Fed.Rule Civ.P. 50(a). (R. 68, R. 69). The guarantors appeal the directed verdict, and the denial of their motion for a new trial or alternatively to reconsider the judgment. We affirm.

I.

Ajayem Investors is a corporation which was the sole shareholder of four lumber companies located in Charlotte, North Carolina; Tampa, Florida; Walden, New York; and Columbus, Ohio. The Modanskys held a majority of the Ajayem Investors' stock and

were the corporate officers of each of the companies; Aaron was president, Sheldon was vice president, and Robert Modansky, a nephew, was chief financial officer. In April 1987, Ajayem contracted for a $15 million revolving loan for the four lumber companies from Continental Bank. The Modanskys personally guaranteed that loan, as did Ajayem Investors. The guarantees were for "unlimited dollars" plus interest. (Joint Exh. 6–13).

The Modanskys requested a $4 million supplement to the $15 million credit line in 1988. The parties intended the additional $4 million to cover outstanding letters of credit supplied by Continental. In pursuit of that additional credit, Robert sent a letter to a Continental vice president Victor Stasica that requested Continental to "[m]ake the expiration date of this special increase May 1, 1988 (rather than March 1, 1988)...." (P.Exh. 1). Robert's letter discussed the $40,000 origination fee that Ajayem was required to pay. The letter stated that the $40,000 would be paid in monthly installments. The letter also stated that "[a]t such time as the additional 4 million dollars in the credit line is no longer needed, it will be discontinued and the remainder of the one point per annum [origination fee] waived." The letter bore a "cc:" designation to Aaron and Sheldon indicating that each was sent a copy of the letter. (P.Exh. 1).

On February 4, 1988, the lumber companies executed the $4 million additional credit agreement, amending the existing $15 million credit limit. The agreement had sections designated A through D. Section A of the agreement stated that the $4 million increase was effective from February 4, 1988 through May 1, 1988, the date Robert specified. Section B stated that on May 1, 1988, the line of credit would revert back to the original terms. (Joint Exhs. 14–16). Aaron and Sheldon signed letters as guarantors of the original credit agreement acknowledging receipt and acceptance of the amendment. Robert also executed a receipt and acceptance letter on behalf of Ajayem Investors. (Joint Exhs. 18–20).

On the May 1 expiration date, the lumber companies executed a second agreement amending the $15 million revolving loan to extend the additional $4 million credit through June 15, 1988. The guarantors again signed letters acknowledging receipt and acceptance of the agreement. (Joint Exh. 42–44). On June 15, the $4 million additional credit expired and the lumber companies did not seek to renew. Because some of the letters of credit were outstanding, their value was added to the debt balance on the original $15 million revolving loan. Meanwhile, the Charlotte and Tampa companies were continuously losing money, (Tr. 183), and the lumber companies became insolvent within a short time. (Tr. 34, 182).

The lumber companies' insolvency gave Continental a right to declare the $15 million revolving loan in default. (Joint Exhs. 1–3). Continental chose to play out its hand, however, and according to the guarantors, Continental used the default status as a trump card to threaten to call the loan due unless the Charlotte and Tampa companies were closed very quickly. (Tr. 182–87). Continental denies that it applied such a strategy, and claims that it merely recommended closing the Tampa and Charlotte companies out of good business judgment because the two companies were suffering severe financial problems. (Tr. 35). The two companies were closed in September 1988. (Tr. 277).

Closing the Tampa and Charlotte branches did not relieve the lumber companies' financial quandary, and may have made it worse. The lumber companies filed for bankruptcy. The guarantors claim that the companies were forced into Chapter 11 bankruptcy reorganization, 11 U.S.C. § 1101, in November 1988 because of the costs associated with short-term liquidation of those companies. (R. 63, App. A, ¶ 16). Continental provided the lumber companies with the financing needed for reorganization, but two years later the reorganization was converted to a Chapter 7 liquidation, 11 U.S.C. § 701. (R. 63, App. A, ¶ 20). Continental declared a default on the $15 million revolving loan, at which point the outstanding balance became due and payable. Although Continental received the proceeds from the liquidation, Continental claims that it is owed more than $4 million. (R. 63, App. A, ¶ 23). Because

the lumber companies cannot pay, Continental called upon the guarantors to cover the balance of the debt. The guarantors refused to pay, and claimed that the guaranties were excused because Continental breached its duty of good faith and fair dealing. The guarantors also claimed that they were discharged from their guaranties because the $4 million credit agreements constituted a material change to the underlying $15 million revolving loan and significantly increased their risk. Finally, the guarantors claimed Continental breached a fiduciary duty, but this and other affirmative defenses and counterclaims were dismissed. (R. 46). *See Continental Bank, N.A. v. Modansky,* 129 Bankr. 159 (N.D.IL 1991).

The case was tried before a jury. Continental moved for a directed verdict at the close of trial but before the jury deliberated. (Tr. 285). During a jury recess, the district court granted the motion and denied an oral motion for reconsideration. (Tr. 348–55). When the jury reconvened, the court did not inform it of the directed verdict and allowed it to deliberate and return a verdict. Like the judge, the jury ruled in Continental's favor. A few days later the district court denied a written motion for reconsideration. (R. 74, R. 75).

## II.

The guarantors claim that Continental breached its duty of good faith and fair dealing in three ways: First, by terminating the additional credit on June 15, 1988; second, by failing to adequately explain the risk associated with the $4 million additional credit; and third, by encouraging liquidation of the Charlotte and Tampa lumber yards. The guarantors also claim that the district court made several errors involving the jury.

*A. The duty of good faith and fair dealing:*

■ We review a Fed.R.Civ.P. 50(a) directed verdict *de novo,* considering the evidence in the light most favorable to the nonmoving party. We will reverse the judgment only if enough evidence exists that might sustain a verdict for the nonmoving party. *Von Zuckerstein v. Argonne Nation-*

*al Laboratory,* 984 F.2d 1467, 1471 (7th Cir. 1993).

■ The parties agree that Illinois law applies to this case. In Illinois, guarantors and lenders have a duty of good faith and fair dealing in the performance or enforcement of a contract. *Magna Bank of Madison County v. Jameson,* 237 Ill.App.3d 614, 617, 178 Ill.Dec. 285, 604 N.E.2d 541 (5th Dist.1992). Good faith requires that the parties exercise honesty in fact, and prudence in the exercise of discretion conferred by contract. *Continental Bank, N.A. v. Everett,* 964 F.2d 701, 705 (7th Cir.1992). The Modanskys argue that the expiration of the $4 million credit agreement was unclear in light of the payment schedule for the origination fee for the additional $4 million credit. That fee was payable in four installments: February 4, 1988, April 1, 1988, July 1, 1988, and October 3, 1988. (Def.Exh. 38). They argue that this is the anchor for the "overwhelming" evidence that the $4 million credit was to extend for one year.

■ We do not agree. The short-term expiration date was clearly set forth in Sections A and B of the credit agreement. Continental did not violate its duty of good faith and fair dealing by honoring that expiration date. The expiration date was a contract term, and the execution of the contract signified the lumber companies' acceptance of that term. If the lumber companies intended that the additional $4 million credit would extend for one year, they should have negotiated a later expiration date. It was not incumbent on Continental to offer a one-year expiration. *See Everett,* 964 F.2d at 703. Continental did not owe the lumber companies a duty of good faith and fair dealing in the negotiation of the contract terms. The guarantors do not claim that Continental negotiated unfairly or fraudulently. The material terms of the amendment were clear on the face of the credit document, and the lumber companies' execution of the document represents their agreement with those terms. *See First Nat'l Bank of Cicero v. Sylvester,* 196 Ill.App.3d 902, 909, 144 Ill.Dec. 24, 29, 554 N.E.2d 1063, 1068 (1st Dist.1990) (listing terms considered material in commercial loan agreements).

Moreover, we do not find conflicting evidence regarding the expiration date, much less "overwhelming" evidence that the $4 million additional credit was to last for one year. At trial, all three Modanskys offered self-serving testimony that they believed the credit was to last for one year. Although Robert's letter to Stasica indicated that he wanted the credit to extend until lumber companies no longer needed it, that qualification was not incorporated in the contract. The only other evidence they offer is the installment payment of the $40,000 origination fee. But despite the inferences they would like us to draw, even the fee payment schedule did not extend for one year. We agree with the Illinois appellate court's observation that it is not the custom and practice of commercial banks to gratuitously extend a note when it becomes due, and that it is the custom for a borrower to seek an extension, rather than for a bank to volunteer it. *Bank of Commerce v. Riverside Trails*, 52 Ill.App.3d 616, 622, 10 Ill.Dec. 384, 389, 367 N.E.2d 993, 998 (2d Dist.1977).

■ Next, the guarantors claim that Continental did not sufficiently inform them of the risks associated with the additional credit guaranties. Continental did not, however, bear the burden of informing the Modanskys of such risks; Continental's duty of good faith and fair dealing arises in the performance, not in the negotiation, of the additional $4 million credit agreements. The additional credit was achieved through separate contracts amending the existing $15 million credit agreement. Continental was not required to discuss all the ramifications of the additional $4 million credit during negotiation of those contracts. We have stated that "Illinois expects guarantors to inquire into risks." *Everett*, 964 F.2d at 704. Ascertaining the risk of the guaranteeing the additional $4 million was the guarantors' duty, not Continental's duty. Only an express contractual duty or a fiduciary relationship would require Continental to speak about the possible consequences of securing the additional credit. *Id.* But the contracts did not require such explanation and Continental was not the Modanskys' fiduciary. The guarantors acknowledge that creditors are not fiduciaries to guarantors merely by virtue of that

relationship. *Magna Bank*, 237 Ill.App.3d at 618, 178 Ill.Dec. at 289, 604 N.E.2d at 545. The guarantors did not fulfill their burden of showing that a fiduciary relationship existed between them and Continental. *Id.*, 237 Ill. App.3d at 619, 178 Ill.Dec. at 288, 604 N.E.2d at 544.

■ Finally, we consider whether Continental violated its duty of good faith and fair dealing by actions it may have taken in conjunction with the Charlotte and Tampa closings. The guarantors argue that Continental forced the premature closing of the Tampa and Charlotte lumber yards, causing the bankruptcy and the default on the $15 million revolving loan. Because we determined that the $4 million credit agreement expired before the Charlotte and Tampa closings, the duty of good faith and fair dealing that the guarantors press must arise from the original $15 million revolving loan agreement.

Taking as true the guarantors' allegations that Continental threatened to pull the loan, we find that act does not violate Continental's duty of good faith and fair dealing as a matter of law. In *Watseka First Nat'l Bank v. Ruda*, 135 Ill.2d 140, 156–59, 142 Ill.Dec. 184, 188, 552 N.E.2d 775, 779 (1990), the Illinois Supreme Court held that when a creditor acts honestly when activating guaranties and utilizing insecurity clauses, the creditor does not violate the duty of good faith even if such actions are not reasonable. In that case, a farmer became insolvent after a bank accelerated the debt the farmer owed to the bank. The guarantors of that debt alleged that the bank did not act in good faith when it accelerated the farmer's debt. The guarantors argued that the bank's alleged failure to act in good faith released them from liability. The Illinois Supreme Court interpreted good faith as applied in a Uniform Commercial Code provision governing situations similar to that which we face here. The court held that because the bank honestly believed it would not be repaid by the borrower, the bank did not breach its duty of good faith by accelerating the debt. *Id.*, 135 Ill.2d at 156–61, 142 Ill.Dec. at 188–91, 552 N.E.2d at 779–782.

Like the bank in *Ruda*, Continental claims that it honestly did not believe it would be repaid the money it was owed and it made its recommendation about the Tampa and Charlotte closings in good faith. The guarantors have not proven otherwise. Even if Continental planned to collect on the loan unless their timetable was followed, it had the right to collect under the contract. We agree with the district court's conclusion that "the bank may have been stupid ... but that is not bad faith." (Tr. 292). The guarantors have not shown that Continental did not deal fairly and in good faith. *Washburn v. Union Nat'l Bank and Trust Co.*, 151 Ill.App.3d 21, 26–27, 104 Ill.Dec. 242, 246, 502 N.E.2d 739, 743 (3d Dist.1986).

*B. Materiality:*

■ The guarantors also argue that the amendments constituted a material change to the original contract obligation and as a result they are released from their guaranties. The guarantors rely on *Bernardi Bros., Inc. v. Great Lakes Distrib. Inc.*, 712 F.2d 1205 (7th Cir.1983). That case also involved an Illinois guaranty dispute. We explained that "[i]t is fundamental that 'a guarantor is not liable for anything which he did not agree to and if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guaranty, the guarantor shall be released.'" *Id.* at 1207 (quoting *Claude Southern Corp. v. Henry's Drive–In, Inc.*, 51 Ill.App.2d 289, 201 N.E.2d 127, 132 (1964)).

In *Bernardi Bros.*, the owner of a car wash took out a bank loan and had it guaranteed. The borrower later incorporated his business and changed its name, but the pool of assets which secured the loan remained the same. The guarantor later sought to escape liability due to the incorporation and name change. We applied Illinois law and held that because the economic relationship between the parties had not changed, the incorporation and name change did not materially alter the contract and did not discharge the loan. *Bernardi Bros.*, 712 F.2d at 1207–08. The *Bernardi* decision was later cited in another Illinois appellate court decision that held: "[T]here must be some change in the entity whose debts are guaranteed that significantly alters the nature of the guarantor's undertaking and results in increased risk to the guarantor." *Alton Banking & Trust Co. v. Sweeney*, 135 Ill.App.3d 96, 89 Ill.Dec. 926, 930, 481 N.E.2d 769, 773 (5th Dist.1985).

In *Sweeney*, a guarantor sought to escape liability because of material changes in her obligation. She guaranteed a loan for a company whose business increased after the guarantee was made. The guarantor argued that her risk increased as business increased, which materially altered her obligation and released her from liability. The appellate court acknowledged that the risk had increased, but held that because the guaranty contained no monetary limit, the guarantor could not claim that the amount of indebtedness exceeded that which was contemplated by the guaranty. *Sweeney*, 135 Ill.App.3d at 103, 89 Ill.Dec. at 931, 481 N.E.2d at 774.

The same holds true here. The guaranties were executed for unlimited dollar amounts. Moreover, even if the $4 million additional credit had significant impact on their risk, the guarantors agreed to the increased risk, as evidenced by the execution of the receipt and acceptance letters. The evidence showed that the Modanskys had considerable experience obtaining financing and loans. We believe the Modanskys' consent to guarantee the loans was informed and binding. *See Riverside Trails*, 52 Ill.App.3d at 622–23, 10 Ill.Dec. at 389–90, 367 N.E.2d at 998–99.

*C. Jury errors:*

■ Finally, the guarantors raise several questions that raise issues of jury bias and errors in jury instructions. We need not consider these arguments because judgment was entered by a directed verdict, which is unaffected by jury bias or faulty instruction.

III.

We hold that Continental did not breach its duty of good faith and fair dealing. We also hold that the amendment to the revolving loan agreement did not discharge the

guaranties. The district court decision is

AFFIRMED.