STAR BANK, KENTON COUNTY,
INC., Appellant,

v.

Ralph PARNELL, Frances Parnell,
Arvind Karnik and Aparna
Karnik, Appellees.

No. 1996–CA–002788–MR.

Court of Appeals of Kentucky.

Sept. 25, 1998.

As Modified Oct. 9, 1998.

Rehearing Denied Dec. 18, 1998.

Discretionary Review
Denied by Supreme Court June 9, 1999.

Robert B. Craig, Crestview Hills, for
Appellant.

R. Christian Macke, Newport, for Appel-
lee.

Before GUIDUGLI, JOHNSON and
KNOPF, JJ.

*OPINION*

JOHNSON, Judge.

Star Bank, Kenton Co., Inc. (the Bank)[1]
appeals from a judgment entered following
a jury verdict that denied the Bank the
right to enforce personal guaranties given

---

1. In 1986, the Bank was known as Peoples
Liberty Bank and Trust Company. In 1988
or 1989, the record is not clear, Star Bank,
Kenton County, Inc. acquired the interest of
Peoples Liberty. For simplicity's sake, we
refer to them singularly as "the Bank."

by Ralph Parnell (Parnell) and Arvind Karnik (Karnik) to secure promissory notes for ARRA Enterprises, Inc. (ARRA), Parnell's and Karnik's recreational vehicle dealership corporation which had declared bankruptcy. Having concluded that there is insufficient evidence to support the jury's verdict, we reverse and remand.

Parnell and Karnik incorporated ARRA in 1983 to purchase the assets of a recreational vehicle (R.V.) and camper sales and rental dealership located in West Chester, Ohio. The Bank loaned Parnell and Karnik each $12,500 and ARRA $25,000 to purchase the dealership. The Bank's vice-president of commercial lending, Clint Carmack (Carmack), assisted in making the loans. Over the next several years, ARRA sought additional funds from the Bank, and on each occasion, Carmack assisted Parnell and Karnik in obtaining the loans. Parnell testified that with the assistance of Carmack, ARRA never had any trouble obtaining financing from the Bank. The assets and the debts of the corporation grew and in December 1985, the Bank approved a $750,000 line of credit for ARRA.

Carmack left the Bank in late December 1985, for a reason not indicated in the record. In early 1986, Dan Baker (Baker) replaced Carmack as vice-president of commercial lending. Baker testified that he reviewed ARRA's file and did not find any documents concerning the financial status of ARRA. In February 1986, Baker estimated ARRA's assets to be valued at $427,000 and determined that ARRA had drawn approximately $635,000 against its line of credit. The difference of over $200,000 between ARRA's assets and ARRA's liabilities caused Baker to be concerned about the Bank's security. Baker then requested financial statements from ARRA for 1984 and 1985. These statements, which Baker received in April 1986, revealed losses for these two years and a negative net worth of approximately $127,000. Baker expressed concern to Parnell and Karnik that the Bank's note was undersecured. He told them that there were two options: to move the line of credit to another bank or to restructure the notes to secure the Bank's position. When ARRA was unable to obtain financing from another bank, Baker asked that Parnell and Karnik provide additional collateral for the loan. This request was based on the following provisions in the note:

Should the holder deem itself insecure, the Obligors shall deliver to the holder such additional Collateral as the holder requests.
* * *

At the holder's option, all Obligations shall become immediately due and payable without notice or demand upon the occurrence of any of the following events of Default:... (vi) if the holder for any good faith reason deems itself insecure....

Parnell and Karnik refused to provide additional collateral. Baker then told them that unless additional collateral was given as security, the Bank would accelerate the note and call it due. On July 15, 1986, Parnell and Karnik personally guaranteed the note and executed second mortgages on their homes. Approximately two weeks prior to restructuring the loan, the Bank "charged off" $224,900 of ARRA's debt.[2]

For the next three years, ARRA had difficulty paying the Bank as well as other creditors. On July 1, 1989, the Bank de-

---

**2.** George Kennedy (vice-president of problem loans for the Bank who had been assigned in 1989 to collect ARRA's debt) and Baker testified that a "charge off" occurs when a bank must disclose and remove from its books the amount of a loan which it deems will not be collected. This is required for accounting purposes and also pursuant to banking regulations. The "charge off" does not alter the obligation of the debtor but it does act to decrease the bank's net worth on paper. A "charge off" reduces a bank's earnings because it requires that funds be set aside by a bank to account for the amount that it does not anticipate receiving from the debtor. George Kennedy testified that a "charge off" is "a terrible thing" for a bank.

clared the loans in default for nonpayment. On March 22, 1990, the Bank brought suit against ARRA, Parnell and Karnik to enforce the personal guaranties on the ARRA notes.[3] It is unclear from the record, but near the same time, ARRA filed for bankruptcy relief.

In June 1996, a jury trial was held. At the close of the evidence, the Bank moved for a directed verdict, which the trial court denied. The jury was instructed as follows:

You shall find in favor of the plaintiff and against the defendants, unless you are satisfied from the evidence that plaintiff did not act in good faith when it made the determination that its loans were insecure and in requesting additional collateral from defendants to secure the loans to ARRA Enterprises, Inc. "Good faith" for purposes of this instruction means honesty in fact in the conduct or the transaction concerned.

The jury was charged under this instruction at approximately 10:30 a.m. Sometime shortly thereafter, the jury sent a note to the trial court with three questions. One question concerned Instruction No. 2, and read as follows: "In instruction no. II, what does 'honesty in fact['] mean? [ ] Moral or legal?" The trial court responded that it could not answer the jury's questions. At approximately 2:00 p.m., the jury sent another note to the trial court which stated as follows: "We cannot come to agreement to question A. [unanimous verdict instruction] 4–8 What should we do? Where's lunch?" The trial court gave the jury a "modified Allen" charge similar to Kentucky Rules of Criminal Procedure (RCr) 9.57. At 2:37 p.m. the jury returned a verdict against the Bank. The Bank

moved the trial court for a judgment notwithstanding the verdict based on the lack of evidence that the Bank had acted "dishonestly or in bad faith." The trial court denied the motion. This appeal followed.

Our standard of review is cogently stated in *Lewis v. Bledsoe Surface Mining Company*, Ky., 798 S.W.2d 459, 461–462 (1990) (citations omitted) as follows:

Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is " 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.' " If the reviewing court concludes that such is the case, it is at liberty to reverse the judgment on the grounds that the trial court erred in failing to sustain the motion for directed verdict. Otherwise, the judgment must be affirmed.

Since this case involves a secured transaction, a review of the relevant provisions of the Uniform Commercial Code (UCC) is required. UCC Section 1–208 (KRS 355.1–208) provides as follows:

---

3. The record does not include the answer and counterclaim of Parnell and Karnik, although there are some references to them in later pleadings. According to the trial brief of Parnell and Karnik, they brought a counterclaim against the Bank on several grounds: breach of the implied covenant of good faith and fair dealing, tortious interference with the operation of ARRA, breach of the Bank's fiduciary duties to ARRA, actual and constructive

fraud, duress, negligent loan administration, and lack of consideration on the refinancing notes. Parnell and Karnik claimed that these were the issues to be tried, and tendered instructions which addressed many of their allegations. However, the sole issue submitted to the jury was set forth in Instruction No. 2. This instruction was identical to the jury instruction submitted by the Bank.

A term providing that one (1) party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

"Good faith" is defined in UCC Section 1–201(19) [KRS 355.1–201(19) ] as "honesty in fact in the conduct or transaction concerned."

■ Kentucky courts have adopted the majority position that "good faith" is a subjective determination. In *Fort Knox National Bank v. Gustafson*, Ky., 385 S.W.2d 196 (1964), one of only two Kentucky cases to discuss the "good faith" requirement of Section 1–201(19), the former Court of Appeals addressed the "good faith" needed to accelerate a bank note when the bank felt insecure. Gustafson had borrowed money to purchase a trailer to operate a diner and entered into a lease for property on which to place the trailer/diner. Within the next two years, the restaurant's checking account was overdrawn thirteen of twenty-five months and the lease payments were eight months in arrears. Gustafson had made 22 of 23 payments on the note, but he had been allowed to remain almost two months behind on the final payment because of the bank's "indulgence." However, the bank argued that this "indulgence" was contingent upon an earlier agreement that Gustafson obtain the consent of all creditors to likewise "indulge" her and that such agreements had not been obtained. The Court stated as follows:

It has been mentioned that the note contained the acceleration clause upon the bank's feeling insecure. The Uniform Commercial Code deals with this basis for acceleration in KRS 355.1–208, as hereinbefore quoted.

It will be observed that the statute places the burden of establishing the lack of good faith upon the party against whom the acceleration power has been exercised. "Good faith" is a golden thread woven into the entire fabric of the Uniform Commercial Code. See KRS 355.1–203. "Good faith," as defined in the Uniform Commercial Code, "means honesty in fact in the conduct or transaction concerned." KRS 355.1–201(19).

By the terms of KRS 355.1–201(8) the "burden of establishing" any fact is said to mean "the burden of persuading the triers of fact that the existence of the fact is more probable than its non-existence." We construe the latter provision as requiring the submission to the jury of the issue of good faith unless the evidence relating to it is no more than a scintilla, or lacks probative value having fitness to induce conviction in the minds of reasonable men. It is our view that the evidence on that score is so conclusive as to warrant a directed verdict for the bank on this issue. It must be remembered that here we are dealing with the "good faith" *belief* of the bank—that is, its state of mind.

385 S.W.2d at 200 (citation omitted) (emphasis original).

Since one of the purposes of the UCC is "to make uniform the law among the various jurisdictions", foreign cases which discuss UCC Section 1–208 and the subjective standard of "good faith" are persuasive. KRS 355.1–102(2)(c). In *Fulton v. Anchor Savings Bank, FSB*, 215 Ga.App. 456, 452 S.E.2d 208, 218 (1994), the Court of Appeals discussed Section 1–201(19) and stated that "[t]he material issue ... 'is not whether the loan was in fact insecure, but whether, in determining the loan insecure, [the bank] acted honestly, in good faith, and not arbitrarily or capriciously....' "

In *Watseka First National Bank v. Ruda*, 135 Ill.2d 140, 142 Ill.Dec. 184, 552

N.E.2d 775 (1990), while discussing the test for "good faith" of Section 1–201, the Supreme Court stated as follows:

> We construe this to mean that section 1–208 permits a creditor to accelerate a debt pursuant to an insecurity clause if that creditor has an honest belief, based on whatever information it has, that the ability of the debtor to repay the debt has in some way become impaired.
>
> This test, which at least one court has termed "the pure heart and empty head" test, appears potentially draconian "because of the great latitude it gives the creditor and the onerous burden of proof it imposes on the debtor." While the debtor's burden of proof may be difficult because the debtor must delve into the creditor's state of mind, the burden is not impossible. That is, the debtor may successfully establish lack of good faith by proving that the creditor did not have possession of the information that the creditor contends caused the acceleration. Similarly, the debtor can establish that the creditor had possession of the information that it asserts caused it to accelerate at the time the loan was made and, as such, the creditor cannot honestly feel less secure than it did when the loan was made.

142 Ill.Dec. 184, 552 N.E.2d at 779 (citations omitted). *Watseka* concluded that "a creditor acts in good faith when exercising an acceleration clause so long as it acts honestly, irrespective of whether the 'reasonable creditor' would have accelerated under the same circumstances. . . ." *Id.* at 782.

In *United States National Bank of Oregon v. Boge*, 311 Or. 550, 814 P.2d 1082 (1991) quoting *Community Bank v. Ell*, 278 Or. 417, 564 P.2d 685 (1977), the Supreme Court described the appropriate standard to be used in determining good faith under UCC Section 1–201(19) as

> "a subjective one, looking to the intent or state of mind of the party concerned. The question is generally one for the jury unless only one inference from the

evidence is possible. Although mere negligence of failure to make the inquiries which a reasonably prudent person would make does not of itself amount to bad faith, if a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be found to have acted in bad faith." As one commentator has phrased it: "[The UCC's definition of good faith] sets forth a 'subjective' standard. In other words, good faith does not require the absence of negligence or the following of the standards of the 'reasonable and prudent' person. All that is necessary is 'a pure heart and empty head.' "

814 P.2d at 1090.

 Parnell and Karnik argue that the Bank's negligence in administering the loan should be considered in determining its good faith. However, Kentucky courts have rejected this argument and determined that the definition of "good faith" does not include negligence. In *Enzweiler v. Peoples Deposit Bank of Burlington, Kentucky*, Ky.App., 742 S.W.2d 569 (1987), Enzweiler, the bank president of Northern Kentucky Bank and Trust (NKTB), guaranteed a borrower's loans at Peoples Bank by signing his name followed by the designation, "president" on one note and merely his name on another note. The borrower defaulted and Peoples Bank sought to enforce the guaranties. NKTB argued that Enzweiler was acting without authority in that, as a bank, it was prohibited by federal law from guaranteeing another's loans. The president of Peoples Bank testified that it was his intention that Enzweiler sign the notes in his official capacity and not as a personal guarantee of payment. Furthermore, Peoples Bank had never sought any personal financial disclosure from Enzweiler. Applying the UCC, the Court determined that NKTB was not liable since it did not and could not have known that Enzweiler was dealing with a borrower at another bank. The Court also

determined that Enzweiler was personally liable because the UCC provides that an unauthorized signature operates to bind the one who signed personally.

Enzweiler, however, argues that even if this is true he is still not personally liable for payment because Peoples Bank did not take the note in good faith as is required by Section 3–404(1). He alleges that Peoples Bank was negligent in not ascertaining Enzweiler's lack of authority, and such is bad faith.

KRS 355.1–201(19) defines good faith as "honesty in fact in the conduct or transaction concerned." This definition simply does not include negligence. We can envision circumstances whereby a lending institution's contrivance to remain ignorant of someone acting without authority would amount to bad faith under the statute. However, if that situation were to arise then the intent would negate negligence by the most elemental definition of the word.

742 S.W.2d at 570 (footnote omitted). It is clear from *Enzweiler* that negligence cannot be considered when determining "good faith."

As our Supreme Court stated in *Crest Coal Company, Inc. v. Bailey*, Ky., 602 S.W.2d 425, 426–427 (1980):

We are acutely aware that an appellate court must give great weight ... to the verdict of a jury. However, where the record shows, as it does here, that only one fair and reasonable conclusion can be drawn from the evidence, the case should not be submitted to the jury.

*See also Wittmer v. Jones*, Ky., 864 S.W.2d 885 (1993).

■ Baker's determination of the Bank's insecurity was based in part on his review of past financial statements and in part on the financial condition of Parnell and Karnik during the first quarter of 1986. In early February, Baker, by memorandum to another Bank employee in the collections department, stated that the Bank, with regard to ARRA, was "under-collateralized." His determination was based on an evaluation of ARRA's assets and liabilities. At this point in time, Baker had not received financial statements from ARRA's accountant. In April, when Baker received those statements which revealed a negative net worth and substantial losses, he deemed the Bank insecure and insisted on further collateral. There was no evidence that Baker's determination to accelerate, in and of itself, was not made in "good faith." Parnell and Karnik state in their brief that there was ample proof of other motives of the Bank to accelerate the note; however, this allegation is simply not supported by the record. Again, any negligence by the Bank in not acquiring knowledge of ARRA's financial condition when the loan was initially approved, does not go to the question of good faith.

Accordingly, we hold that Parnell and Karnik failed to meet their burden of proving that the Bank did not act in good faith in deeming itself insecure. Thus, the trial court erred in denying the Bank's motion for a directed verdict. The judgment of the Kenton Circuit Court is reversed and this matter is remanded for entry of a judgment in favor of the Bank.

All concur.